## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *Ex rel.* Michael J. Fisher, and Michael Fisher, | § | |
| Individually, and Brian Bullock, and Brian | § | QUI TAM PLAINTIFFS/RELATORS' |
| Bullock, Individually, | § | SECOND AMENDED COMPLAINT |
| | § | PURSUANT TO |
| Plaintiffs, | § | 31 U.S.C §§ 3729-3732 |
| | § | (FEDERAL FALSE CLAIMS ACT) |
| vs. | § | |
| | § | **Case No. 4:12cv461** |
| Homeward Residential, Inc. f/k/a American | § | |
| Home Mortgage Servicing, Inc. ("AHMSI") | § | JURY TRIAL DEMANDED |
| and Ocwen Financial Corporation. | § | |
| | | |
| Defendants. | | |

## RELATORS' SECOND AMENDED COMPLAINT
## PURSUANT TO 31 USC §§ 3729-3732, FALSE CLAIMS ACT

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher and Brian Bullock**

/s/ Samuel L. Boyd
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe Texas
Texas SBN: 10668280
BOYD & ASSOCIATES, PC
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Tel (214) 696-2300
Fax (214) 363-6856
sboyd@boydfirm.com

***Counsel for Qui Tam Plaintiff/Relator***

/s/ Thomas M. Melsheimer
Thomas M. Melsheimer
txm@fr.com
Texas Bar No. 13922550
Chad B. Walker
cbwalker@fr.com
Texas Bar No. 24056484
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile*)*

/s/ William T. "Tommy" Jacks
jacks@fr.com
Texas Bar No. 10452000
**FISH & RICHARDSON P.C.**
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)

*Counsel for Qui Tam Plaintiffs/Relators*

/s/ Roger D. Sanders
Roger D. Sanders
TX SBN 17604700
J. Michael Young
TX SBN 00786465
Sanders, O'Hanlon, Motley & Young, PLLC
III South Travis
Sherman, TX 75090
(903) 892-9133 (Tel.)
(903 892-4300 (Fax)

*Local Counsel for Relators*

# Table of Contents

I. SUMMARY ..................................................................................................... 3

II. PARTIES ...................................................................................................... 9

    A.   Successor Liability ............................................................................... 11

III. JURISDICTION AND VENUE ................................................................ 14

IV. HOME AFFORDABLE MODIFICATION PROGRAM ........................ 15

V. FACTS ......................................................................................................... 19

VI. HOMEWARD HAMP AND NON-HAMP LOAN MODIFICATIONS ......................... 26

VII.   FEDERAL HOUSING ADMINISTRATION ("FHA") VIOLATIONS ................... 31

    A.   Violations of FHA Loss Mitigation Requirements .......................... 32

       1.   Failure to implement a FHA-compliant Quality Control program .................. 33

       2.   Failure to engage in FHA specific loss mitigation procedures ........................ 33

       3.   Improperly servicing FHA loans off-shore ........................................ 35

    B.   Homeward's False Certifications ....................................................... 36

VIII. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES ............................. 39

    A.   UDAAP and UDAP ............................................................................ 39

    B.   DODD-FRANK ACT .......................................................................... 41

       1.   Unfair ............................................................................................ 42

       2.   Deceptive ........................................................................................ 44

       3.   Abusive .......................................................................................... 45

    C.   "In-Flight" Modifications .................................................................. 46

    D.   Loss Mitigation – Modification Delays and Denials ........................ 47

    E.   Unlawful Failure to Suspend Foreclosure ........................................ 49

IX.   REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) ...................... 51

    A.   Untimely Transferee/Transferor Letters to Borrowers ................. 52

    B.   Additional Violations of RESPA ....................................................... 53

X. TRUTH IN LENDING ACT AND REGULATION Z ............................. 54

XI. STATE LAWS AND REGULATIONS ..................................................... 61

    A.   Texas Constitutional and Administrative Law ............................... 64

       1.   Constitutional Law ...................................................................... 64

       2.   *Sims* "Extensions of Credit" triggering Section 50(a)(6) applications ............ 68

3.   The Relevant Situation ................................................................ 70

4.   **Pervasive Violations by Purchase Money Mortgage Modifications in Texas .....** 73

5.   **Loan-to-value Ratio** ................................................................... 74

6.   **Closing Location** ...................................................................... 74

7.   **Texas Notice of Right of Rescission** ......................................... 75

8.   **Full Amortization** ..................................................................... 75

9.   **Examples of Homeward Texas Modification Contracts** ................ 76

10.   **Homesteaders, In Effect, Become "Renters"** ............................ 79

B.   **New York State Law** ...................................................................... 80

1.   **Homeward Examples of NY Modification Contracts** .................... 83

C.   **Massachusetts Law** ........................................................................ 84

1.   **Mass. Right of Rescission** ........................................................ 87

2.   **Homeward Examples of Massachusetts Modification Contracts** ...... 88

**XII. FAILURE BY HOMEWARD TO SELF-REPORT** ............................... 90

**XIII. FALSE CLAIMS ACT** ........................................................................ 91

**XIV. CAUSES OF ACTION** ......................................................................... 93

A.   **First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)** ............... 93

B.   **Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)** .......... 93

**PRAYER AND REQUEST FOR RELIEF** ............................................... 93

The United States of America, by and through *qui tam* Plaintiffs/Relators, Michael J. Fisher ("Relator Fisher") and Brian Bullock ("Relator Bullock"), brings this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act") against Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. ("AHMSI" or "Homeward") (also collectively, "Defendants") to recover all damages, penalties and other remedies available under the False Claims Act on behalf of the United States and Relators. Relators file this Second Amended Complaint in order to join Ocwen Financial Corporation ("OFC") as a Defendant for its contractual assumption of Homeward's presale liabilities for liabilities alleged herein, and in support would show the Court as follows:

## I. SUMMARY

1.      Homeward was a participant in the Government's Home Affordable Modification Program ("HAMP"), through which the United States incentivizes borrowers, note owners and servicers of residential home mortgages to modify the borrower's home loans by lowering interest rates and payments, extending terms, and possibly forgiving principal, to help American homeowners avoid foreclosure and to attempt to stabilize financial markets supported by home mortgages in various formats. Homeward violated the False Claims Act by fraudulently inducing Fannie Mae, agent for the United States, to execute the Homeward Servicer Participation Agreement by falsely representing, warranting and covenanting therein, at Exhibit B, Form of Financial Instrument at ¶5.b and Exhibit C, Form of [Annual] Certification at ¶2 that it was (1) initially in compliance and annually represented and certified that all Services "will be performed in compliance with, all applicable Federal, state and local laws, regulations,

regulatory guidance, statutes ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq., the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights"; (2) it obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has obtained or will obtain all consents necessary to authorize the performance of its obligations under the Programs and the Agreement; (3) the performance of Services under the Agreement will not conflict with, or be prohibited in any way by, any other agreement or statutory restriction by which Servicer is bound, provided, however, that Fannie Mae acknowledges and agrees that this representation and warranty is qualified solely by and to the extent of any contractual limitations established under applicable servicing contracts to which Servicer is subject; (4) it is not aware of any other legal or financial impediments to performing its obligations under the Program or the Agreement and shall promptly notify Fannie Mae of any financial and/or operational impediments which may impair its ability to perform its obligations under the Program or the Agreement; and (5) it is not delinquent on any Federal tax obligation or any other debt owed to the United States or collected by the United States for the benefit of others, excluding any debt or obligation that is being contested in good faith. Homeward certified compliance in its Servicer Participation Agreement (SPA) with the United States and in

subsequent mandatory annual recertification, all of which were and are express conditions of payment under the HAMP SPA.[1] Each recertification falsely represented that, "Servicer is in compliance with, and [falsely] certifies that all [past] Services **have been performed** in compliance with, all applicable Federal, state and local laws, regulations…." *See* Exhibit 1; Exhibit C, Certification at ¶ 2.

2.      Homeward has also continuously failed to meet the basic and fundamental federal requirements related to the servicing of delinquent conventional and FHA loans under the mandated loss mitigation programs**.** For example, Homeward, while participating in HAMP, did not have any FHA-compliant loss mitigation program. Notwithstanding that FHA laws and regulations mandated that Homeward immediately institute a qualified compliant loss mitigation program, Homeward did not have compliant loss mitigation program for its FHA borrowers. Management was on repeated, express notice from employees of the resulting hardship and losses of FHA borrowers, but executive management was unmoved to stem the personal suffering of these mostly middle class families. Homeward made false representations that it did have such a program (1) to HUD representatives and (2) to hundreds, if not thousands, of innocent, sometimes delinquent, FHA/VA borrowers seeking loss mitigation options to save their homes from foreclosure. **Hundreds if not thousands of families lost their homes** because of Homeward's knowing refusal to staff and train representatives who could have offered loss mitigation options to (1) save homes and (2) **minimize the** government's FHA insurance losses. As Homeward certified in the SPA, "(4) it is not aware of any other legal or financial

---

[1] *AHMSI Servicer Participation Agreement* is attached hereto at **Exhibit 1**.

impediments to performing its obligations under the Program or the Agreement and **shall promptly notify Fannie Mae of any financial and/or operational impediments** which may impair its ability to perform its obligations under the Program or the Agreement. Yet Defendant never properly made the expenditures to properly staff, train or execute the HAMP or FHA HAMP or VA loan modifications, and further it never notified Fannie Mae of any operational or financial impediments. The Defendant's numerous, false representations, regarding certifications/warranties/covenants of compliance with HAMP requirements and obligations and all other federal, state and local consumer lending laws, regulations and rules, including GSE, FHA and Ginnie Mae loss mitigation requirements, rendered the initial and sequential certifications provided by Homeward in the SPA, and each annual certification thereafter, a false certifications/statements. These false representations covered up the unnecessary loss of borrowers' homes to foreclosure, at the exact time that the affected borrowers were falsely and repeatedly told by Homeward that modification relief was being "reviewed and in process" on the borrower's modification package. The government's damages include the submission of false claims resulting from (1) Homeward's fraudulent inducement of the SPA, which likely exceed nine figures, and (2) insurance fraud relating to Homeward's fraudulent FHA/VA conduct also very material after the trebling under the FCA.

3.    The Truth in Lending Act ("TILA"), 15 U.S.C. §1601 *et seq.*, and several Federal statutes have a prominent identification in this certification, (no more important, however, than other Federal, state and local laws regulations, regulatory guidance, statutes, ordinances, codes and requirements) and ecomprise laws designed to prevent unfair, discriminatory or predatory lending practices. The notice of the right to rescind is required, in the first instance by TILA and

its implementing rules, known as Regulation Z (Reg. Z, § 1026.23(a)-(b) (additionally, required by Massachusetts, Texas and New York state laws) . Homeward further violated the False Claims Act by falsely stating, again, in its annual recertification to the United States that it was in compliance with and certified that all Services had been performed in compliance with the same Federal and state laws in all of its business, including but not limited to its HAMP modifications. The statements regarding compliance in the annual recertification were false, and its certifications were false records used by Homeward to continue to participate in the HAMP program and receive large incentive payments from the United States. Homeward continued to knowingly fail to provide consumers with notices of the right to rescind HAMP and non-HAMP loan modification agreements entered between the borrowers and Homeward, as required by TILA, Texas, New York and Massachusetts laws designed to prevent unfair, discriminatory or predatory lending practices.[2] The modifications **virtually always <u>increased</u>** the borrowers' principal balances by capitalizing past due interest, and past due property taxes and, at times, amounts for prospective property taxes and insurance premiums not yet due, the latter of which began accruing interest for the first time on all of these capitalized past due and prospective sums, as well as for some, undefined modification fees or costs which did not arise out of the (i) original note or (ii) deed of trust. The modifications frequently included step rate adjustments, pursuant to which the interest rate, and thus the payment, increased at predetermined dates and increments. Without the statutorily required notice that the borrower had three days after consummation of the agreement to rescind, the borrower lacked the important information that

---

[2] 12 C.F.R. 1026 (Regulation Z); Tex. Const. Art. XVI, § 50. (a)(6)(Q)(viii); Mass. Gen. Laws Ch. 140D § 10(b).

there was still time to back out of what the borrower might realize was neither in his or her best interest nor that of his or her family. The borrower was entitled to consider his or her modification ramifications with "Eyes Wide Open," the very essence of the Notice of the Right of Rescission in Reg. Z.[3] This material omission was to the detriment of the borrower, while Homeward enjoyed unlawful benefits of receiving many millions of dollars of incentive payments on the basis of its false statements and false certifications to the United States.

4. Several of Homeward statements in its SPA regarding present and future compliance with federal and state consumer and other lending laws were false, and the allegations in the SPAs were thus false statements and false records used by Homeward to fraudulently induce the United States and thereby obtain the full range of incentive payments from the United States. Homeward knowingly continued to fail to (i) provide consumers with notices of the right to rescind its proprietary loan modification agreements entered between borrowers and prior to its participation in HAMP (at which time Homeward also represented its compliance in its initial SPA), and (ii) comply with state laws (including at least Texas, New York and Massachusetts) designed to prevent unfair, discriminatory or predatory lending practices; including, but not limited to state Unfair and Deceptive Acts and Practices ("UDAP") laws, and state consumer lending laws (Texas, New York and Massachusetts). For example, for loans secured by Texas real property, under the Texas Constitution, when an **extension of credit** "involves [1] the satisfaction or replacement of the original note, [2] an advancement of new funds, or [3] an increase in the obligations created by the original note," it is subject to the home

---

[3] 12 C.F.R. 1026.1 *et seq.*

**Relators' Second Amended Complaint**                                                    **8**

equity provisions/protections set out at Section 50(a)(6). In such an event, Section 50(6) requires, inter alia, (1) providing notices to borrowers of the right to rescind, (2) that the resulting mortgage loan debt not exceed 80% of the value of the property, (3) that the loan not generate resulting balloon payments, that the principal debt be amortized, monthly, (4) that the closing of the loan modification occur, only, in an (a) attorney's office, (b) title company office or (c) the lender's office, and more. Many Texas loan modifications that Relator Fisher has reviewed have violated this well-established Texas Constitution standard.

## II. PARTIES

5.       Relator Michael Fisher is a citizen of the United States and a resident of Southlake, Texas. Relator Fisher was employed in the area of loan modification contracts from 2008 until early 2012. During that time, Relator Fisher served as an assistant to attorneys at law firms in Brea, California (now located in Industry, California) and Southlake, Texas, which assisted clients with obtaining modifications of their residential property mortgage loans from Homeward and other lenders or loan servicers. He reviewed loan modification contracts for each law firm. Additionally, he has received and reviewed thousands of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including Homeward.

6.       Relator Brian Bullock is a citizen of the United States and a resident of Plano, Texas. Relator Bullock was formerly employed at Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. Relator Bullock has fifteen years of experience in the Financial Services industry, including default services and foreclosure.

**Relators' Second Amended Complaint**                                                                                     **9**

7.     Defendant Homeward Residential, Inc. f/k/a American Home Mortgage Servicing, Inc. ("AHMSI" or "Homeward"), was/is a Delaware corporation with its principal place of business in Coppell, Texas. According to its website, Homeward is the 13th largest mortgage servicer in the country, managing nearly $71 billion in loan servicing for approximately 374,000 customers. Since its formation in April, 2008, Homeward has modified more than 195,000 mortgage loans, including more than 33,000 under the U.S. Government's Making Home Affordable Program. In addition to its Coppell, Texas headquarters, Homeward, at relevant times, has had offices in Addison, Texas, Jacksonville, Florida, Mount Laurel, New Jersey, and Pune, India. Homeward has been served and has entered an appearance herein.

8.     On December 27, 2012, Homeward was purchased by Defendant Ocwen Financial Corp. ("OFC," NYSE: OCN), a Florida corporation with its principal place of business in Atlanta, Georgia, for an aggregate purchase amount of $766 million. At the time of purchase, Homeward had a servicing portfolio of more than 422,000 loans with an unpaid principal balance of $77 billion. **Exhibit 2, OFC 10-K at p. 4.** Defendant OFC can be served with process by making service upon its registered agent, Corporation Service Company dba CSC- Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

**9.**     Until he was forced in December of 2014 to resign as part of a consent agreement with the New York Department of Financial Services, because of the unlawful servicing of loans by OFC and its subsidiaries, William S. Erbey had been OFC's Executive Chairman of the Board of Directors (since September 1996), was its Chief Executive Officer from January 1988 to October 2010, and controlled the company since it was founded in 1987. Ronald M. Faris, who approved the New York Consent Decree, has been OLS's President since March 2001, its Chief

Executive Officer since October 2010 and a Director since 2003; he joined the company in 1991.

OFC, through its subsidiaries, is a leading provider of residential and commercial mortgage loan

servicing, special servicing and asset management services. In addition to its Atlanta

headquarters, OFC has offices in West Palm Beach and Orlando, Florida, Houston, Texas,

McDonough, Georgia, and Washington, DC and support operations in India and Uruguay. As of

December 31, 2013, OFC and its subsidiaries serviced 2,861,918 residential loans with an

aggregate unpaid principal balance (UPB) of $464.7 billion. **See Exhibit 2, *OFC Form 10-K***

***Annual Report*, filed 03/03/14 for the period ending 12/31/13 ("OFC 10-K") at pp. 4, 17, 26.**

OFC and its predecessors have been servicing residential mortgage loans since 1988 and

subprime mortgage loans since 1994. As of December 31, 2013, OFC and its subsidiaries also

serviced commercial assets totaling $2.6 billion. OFC 10-K at pp. F-37. OFC and its subsidiaries

completed 450,000 home loan modifications from 2008 through 2013. OFC 10-K at p. 3.

## A.      Successor Liability

Under certain circumstances, a corporation that purchases another corporation is

responsible for the seller's debts or liabilities, including "where (1) the purchaser **expressly** or

**impliedly** agrees to assume the obligations; (2) the purchaser is merely a **continuation** of the

selling corporation; or (3) the transaction is entered into to escape liability." *In re La. Crawfish*

*Producers*, 772 F.3d 1026, 1030 (5th Cir. 2014) (quoting *Golden State Bottling Co. v. NLRB*,

414 U.S. 168, 182 n.5, 94 S. Ct. 414, 38 L. Ed. 2d 388 (1973). As part of the Homeward

acquisition, Homeward and OFC entered agreements pursuant to which OFC assumed

substantial, if not virtually unlimited, portions of Homeward's pre-sale liabilities.[4] Even absent

the **express** or **implied** agreements by OFC to assume Homeward's liabilities, OFC operated the

former Homeward as a mere **continuation** of the selling entity.[5] Homeward was the acquired

---

[4] "**As a part of the Homeward Acquisition, the sellers and Ocwen have agreed** to indemnification provisions for the benefit of the other party. **In particular,** the sellers have agreed to retain 75% of contingent liabilities for losses arising out of potential third-party claims in connection with the seller's pre-closing servicing or accounting errors, settlements with government authorities, and settlements, penalties or compensatory fees incurred with GSEs, up to $100 million of such losses. Sellers have escrowed $75 million of the purchase price for the Homeward Acquisition
for 21 months from the date of the closing to pay any amounts owed in respect of such losses. **Ocwen has agreed to be liable for (i) 25% of any such losses up to $100 million and (ii) 100% of such losses, if any, in excess of $100 million." See OFC 10K filed 03/03/14 for period ending 12/31/13 at p. 23.**

[5] OFC's 8-K/A filed 03/15/13 for the period ending 12/27/12, the company explained:

> **Explanatory Note**
>
> On December 27, 2012, Ocwen Financial Corporation ("Ocwen") completed the previously announced Merger (as defined below) pursuant to that certain Merger Agreement by and among Ocwen, O&H Acquisition Corp., a Delaware corporation and a wholly-owned subsidiary of Ocwen ("Merger Sub"), Homeward Residential Holdings, Inc., a Delaware corporation ("Homeward," formerly known as AHMSI Holdings, Inc.), and WL Ross & Co. LLC, a Delaware limited liability company as shareholder representative, pursuant to which Merger Sub merged with and into Homeward **with Homeward continuing as the surviving corporation and becoming a wholly-owned subsidiary of Ocwen (the "Merger").** Information relating to the Merger was previously included in Ocwen's Current Report on Form 8-K, filed with the Securities and Exchange Commission (the "SEC") on October 5, 2012. The completion of the Merger was previously reported in Ocwen's Current Report on Form 8-K, filed with the SEC on December 28, 2012.
>
> This Amendment No. 1 on Form 8-K/A is being filed to amend the Current Report on Form 8-K (the "Initial 8-K") filed by Ocwen Financial Corporation on December 28, 2012, to include the financial information referred to in Item 9.01(a) and (b), below, relating to the acquisition of Homeward and to provide the consent of the independent accountants. Pursuant to the instructions to Item 9.01 of Form 8-K, Ocwen Financial Corporation hereby amends Item 9.01 of the Initial 8-K to include previously omitted financial statements and pro forma financial information and to provide the consent of the independent accountants.
> . . .
> **Item 2.01 Completion of Acquisition of Assets**

As previously reported, on December 27, 2012, Merger Sub merged with and into Homeward. **Homeward was the surviving corporation in the Merger and, as a result, is now a wholly-owned subsidiary of Ocwen. In the Merger, Ocwen acquired the mortgage servicing rights and subservicing for approximately 421,000 residential mortgage loans with an unpaid principal balance of approximately $77 billion. Ocwen also acquired Homeward's loan origination platform and its diversified feebased business that includes property valuation, REO management, title, closing and advisory services.** As consideration for the Merger, Ocwen paid $243 million plus the book value amount of Homeward and its subsidiaries, for an aggregate purchase price of $765.7 million. Of this amount, $603.7 million was paid in cash and $162 million was paid in Preferred Stock. $85 million of the Merger Consideration has been placed into escrow for a period of 21 months following the closing date to fund any loss sharing payments and certain other indemnification payments that may become owed to Ocwen, as well as to fund certain expenses of WL Ross & Co. LLC as shareholder representative.

…

**1) Organization and Business Overview**

Homeward Residential Holdings, Inc. (Homeward) was incorporated in Delaware on March 22, 2011, and serves as the holding company for Homeward Residential, Inc. (ServicingCo). ServicingCo, a Delaware corporation, engages primarily in servicing residential mortgage loans for investors, the majority of which are nonprime mortgage loans. Homeward and ServicingCo were formerly known as AHMSI Holdings, Inc. and American Home Mortgage Servicing, Inc., respectively, and changed their legal name effective May 29, 2012.

On April 12, 2011, ServicingCo effected a reorganization through a merger transaction resulting in the placement of a holding company, Homeward, between ServicingCo and its stockholders. Certain private equity funds that are ultimately controlled by WL Ross & Co. LLC (collectively, the Parent) owned substantially all of the outstanding shares of stock of Homeward as of September 30, 2012 and 2011. The Parent owned substantially all of the outstanding shares of stock of ServicingCo prior to the reorganization. At September 30, 2012, ServicingCo owned all of the outstanding stock of its primary operating subsidiaries: Cooper River Financial, LLC (Cooper River), Power REO Management Services, Inc. (Power REO), Power Valuation Services Inc. (Power Valuations), Power Default Services, Inc. (Default Services), Homeward Residential Corporation India Private Limited (AHIPL), Beltline Road Insurance Agency, Inc. (Insurance Agency), American Home Mortgage Lending Solutions, Inc. (ALSI), and MSR Holdings, Inc. (MSR Holdings). ServicingCo has three operating locations in the United States (Coppell, Texas; Addison, Texas; and Jacksonville, Florida); and back office support operations in Pune, India.

Homeward, **ServicingCo** and the operating subsidiaries of ServicingCo are collectively referred to as "the Company." **The prior activities of ServicingCo are included in the consolidated financial statements of the Company as the reorganization activities are between entities under common control.** Presentation of the financial results of the Company and the accompanying notes are related to the years ended September 30, 2012

entity in the purchase, and whereupon it became a wholly owned subsidiary of OFC.[6]  Therefore, OFC acquired all of Homeward's mortgage servicing rights upon which the allegations in this case arise.[7] "Ocwen also acquired Homeward's loan origination platform and its diversified fee based business that includes property valuation, REO management, title, closing and advisory services."[8] The business operations, for a substantial period (est. 9 months) of time, of the old Homeward as part of the new entity were substantially the same, as the employees of the new company were doing the same jobs, in the same working conditions, reporting to the same supervisors, and the new company had the same production process, provided the same services, and basically had the same body of customers or clients. Moreover, senior management remained substantially the same. For these additional reasons, beyond OFC's express and implied contractual assumption, OFC was liable for the continuation of Homeward's liabilities arising from its unlawful mortgage servicing practices.

## III. JURISDICTION AND VENUE

9.     This matter is within the Court's federal question jurisdiction, as Relator brings this action under 31 U.S.C. § 3730(b)(1). Venue is proper in the Eastern District of Texas, where Homeward transacts substantial business and where violations of the False Claims Act occurred in part, pursuant to the False Claims Act, 31 U.S.C. § 3732(a). This action seeks remedies on behalf of the United States for Defendant's multiple violations of 31 U.S.C. § 3729.

---

and 2011.
[6] *Id.*
[7] *Id.*
[8] *Id.*

## IV. HOME AFFORDABLE MODIFICATION PROGRAM

10.     In approximately mid-to late 2008, an industry sprang up to help financially troubled homeowners save their homes by negotiating loan modifications with the servicers[9] of the loans. In the third quarter of 2009, the U.S. Treasury Department rolled out the Home Affordable Modification Program ("HAMP")[10] to encourage lenders to modify home-secured loans. Under HAMP, loan servicers, investor/owners of loans, and borrowers receive incentive payments from the Government in connection with granting the modification and keeping the modified payments current (borrowers' incentives are paid to the servicer to be applied as principal reduction paid to the owner/investor). On August 19, 2010, pursuant to its Supplemental Directive 10-09,[11] the Treasury Department issued the Making Home Affordable

---

[9] A loan servicer is an entity that may or may not be the original lender or the owner of a loan. It need not be a bank but may be. Servicers that are not the owners are paid by the owners of the loans to collect monthly payments and generally manage the borrowers' accounts on a day-to-day basis. Servicers sometimes buy the right to service groups of loans.

[10] In addition to the Treasury Department's HAMP program for non-GSE loans—loans not owned by Government-Sponsored Entities, the Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac)—Fannie Mae, Freddie Mac, the VA, and the FHA administer their own versions of HAMP pursuant to the Government's Making Home Affordable initiative.

[11] On March 1, 2013, Supplemental Directive 13-01 issued, effective May 1, 2013. Supplemental Directive 10-09 is available at  https://www.hmpadmin.com/portal/programs/guidance.jsp  (click on "archives," under 2010 MHA Supplemental Directives click on 10-09, last visited 9/2/14).

Program   Handbook   for   Servicers   of   Non-GSE   Mortgages[12]   ("MHA   Handbook"),
https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1009.pdf, which governs the
procedures for HAMP loan modifications.

11.     The MHA Handbook states "[t]his Handbook constitutes Program Documentation
under the Servicer Participation Agreement and is incorporated by reference into the Servicer
Participation   Agreement."   ***MHA   Handbook   v.   4.3***,   at   p.   14,
**https://www.hmpadmin.com/portal/programs/guidance.jsp (last accessed February 25,
2014).**[13] The Servicer Participation Agreement is part of the uniform agreement between a
servicer and the Government's financial agent Fannie Mae as designated by the Treasury
Department   ("Commitment   to   Purchase   Financial   Instrument   and   Servicer   Participation
Agreement"),   pursuant   to   which   the   servicer   may   participate   in   HAMP,   2MP   (Treasury   and
HUD's Second Lien Modification Program), Treasury FHA-HAMP, RD-HAMP (Department of
Agriculture's Rural Housing Service HAMP program), or FHA2LP (FHA refinance program for
underwater   loans) for   loans   that   are   not   owned,   securitized,   or   guaranteed   by   Fannie   Mae   or
Freddie Mac, and the Government compensates the servicer, loan owner(s), and borrower(s). The
form of the Servicer Participation Agreement can be accessed at

**http://www.hmpadmin.com//portal/programs/servicer.jsp** (last accessed February 25, 2014).

_____

[12] Non-GSE mortgages are mortgages not owned by government-sponsored entities ("GSEs") such as the
Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation
(Freddie Mac).

[13] On March 3, 2014 the Treasury Department issued Version 4.4 Making Home Affordable Program
Handbook for Servicers of Non-GSE Mortgages.

**Relators' Second Amended Complaint**                                                  **16**

12.     In the MHA Handbook v. 4.3, (September 16, 2013), every servicer is put on notice of the following requirement:

**1.6 Compliance with Applicable Laws**

Each servicer and any sub-servicer that the servicer uses will be subject to and must fully comply with all federal, state, and local laws, including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions…

*MHA Handbook v. 4.3*, **at p. 32 ¶ 1.6.**

13.     Under HAMP, incentive fees paid to the servicer by the Government, which currently can equal up to $4,600 per HAMP modification, and similar, separate fees paid by the Government to the lender/investor owners of the loans, are designed to fully compensate the servicer and investor owners for all costs associated with granting the HAMP modification.

14.     The United States also pays up to $83.33 per month for the benefit of borrowers, to be applied to the borrowers' loan balance as principal reduction, accruing monthly and paid annually for the first five years as long as the loan is in good standing where the modification reduces the monthly housing expense by 6% or more and the property is owner occupied. These payments are made by the Government to the servicer for payment to the owner/investor as credits to the borrower's loan balance**. *See* MHA Handbook v. 4.3, at pp. 141 ¶ 13.2; Exhibit 3, *MHA Compensation Matrix*, dated July 31, 2012 at p. 2, § 5.** Thus the United States pays for the benefit of the borrower (and the owner of the loan, which receives payment on the loan) up to a maximum of $5,000.

15.     Pursuant to the *current* HAMP servicer Compensation Matrix, last updated January 24, 2014, a servicer receives a one-time payment of $400-1600 from the Government for

each completed permanent HAMP modification with an effective date of the trial period plan on or after October 1, 2011 and before March 1, 2014; the amount of this incentive payment depends on the number of days the specific loan was delinquent. The Compensation Matrix was previously updated several times (including an update effective October 1, 2011 to reflect changes to servicer incentives detailed in Treasury Supplemental Directive 11-06 Making Home Affordable Program—Updates to Servicer Incentives). Under the incentive schedules prior to these changes, the servicer received $1,000 for each completed modification under HAMP with a trial period plan effective date before October 1, 2011, without regard to whether the borrower was delinquent; however, for permanent HAMP modifications with a trial period plan effective date before October 1, 2011, the servicer received an additional $500 if the borrower was not delinquent at the time of the modification[14] for a maximum one-time, initial payment of $1,500 under pre-October 1, 2011 incentive schedules. ***MHA Compensation Matrix*, last updated January 24, 2014 at p. 1-2,**

**https://www.hmpadmin.com/portal/programs/hamp.jsp#8** (last accessed

February 25, 2014); **MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3**.

16.     In addition to the <u>initial</u> modification completion incentive payment, servicers are paid "Pay for Success" incentives of up to $83.33 per month, which are accrued monthly and paid annually on the anniversary date of the permanent HAMP loan modification for a period of thirty-six (36) months for modified loans that remain in good standing. Thus, servicers may, post-October 1, 2011 plan, be paid up to $4,600 for a permanent HAMP loan modification that

---

[14] This payment is no longer applicable, for modifications with a post-October 1, 2011 effective date.

continues in good standing for thirty-six (36) consecutive months ($1,600 for modification plus $3,000 maximum total good standing payments). Prior to October 1, 2011, the servicer could be paid up to $4,500 for a permanent HAMP loan modification where the borrower was not delinquent at the time of the trial period effective date and continued in good standing for thirty-six (36) consecutive months ($1,000 for modification plus $500 bonus plus $3,000 maximum total good standing payments); for a borrower who was delinquent at the time of the trial period effective date, the servicer could be paid up to $4,000 ($1,000 for modification plus $3,000 maximum total good standing payments). **MHA Handbook, v 4.3, p. 139 at ¶ 13 – p. 141 at ¶ 13.1.3; Exhibit 3,** *MHA Compensation Matrix* **dated July 31, 2012, at pp. 1-3.**

17.     Investors/owners of the loans are paid an initial, one-time modification fee of $1,500 for modifications that lower the monthly housing expense by 6% or more and the property is owner occupied. Investors are paid by the United States (via payment to the servicer for the investor) good standing incentives accruing monthly and paid annually for up to five years pursuant to more complex formulas. Investors can also receive Investor Home Price Decline (HPDP) Incentive Payments for two years or Principal Reduction Alternative Payments for up to three years, pursuant to similar formulas based in part on amount of principal reduced. **MHA Handbook v. 4.3, at pp. 142-144 ¶ 13.3.4.2 (formulas for investor incentives);** *MHA Compensation Matrix***, dated July 31, 2012 at pp. 1-3, §§ 3 -7 (Exhibit 3).**

## V. FACTS

18.     Jordan D. Dorchuck, Executive Vice President of Homeward, executed on behalf of Homeward on July 9, 2010, a Commitment to Purchase Financial Instrument and Servicer Participation Agreement with Fannie Mae as financial agent for the United States (accepted by

Fannie Mae on July 22, 2009). As a HAMP participant, the obligations, representations, warranties and covenants of Homeward under its agreement survive the expiration or termination of its agreement effective July 9, 2010. **Exhibit 1 at p. 10.**

19.      Homeward's Servicer Participation Agreement (Exhibit 1) provides for required representations, warranties, and certifications by Homeward, the Servicer, within the Servicer Participation Agreement itself and in subsequent annual certifications:

> **Servicer's representations and warranties, and acknowledgement** of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Programs and under the Agreement **are set forth in the Financial Instrument.** Servicer's **certification** as to its **continuing compliance** with, and the **truth and accuracy of, the representations and warranties set forth in the Financial Instrument** will be provided annually in the form attached hereto as <u>Exhibit B</u> (the "**Certification**"**),** beginning on June 1, 2010 and again on June 1 of each year thereafter during the Term (as defined below).

**Exhibit 1, AHMSI Servicer Participation Agreement, at p. 2 ¶ 1B.**

20.      In paragraph 5(b) of the "Representations, Warranties and Covenants" of the Financial Instrument, which is a part of the Servicer Participation Agreement, at the time of executing its agreement, Homeward represented, warranted, and covenanted that:

> (b)      Servicer **is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing Act **and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices** and all applicable laws governing tenant rights. Subject to the following sentence, Servicer has obtained or made, or will obtain or make, all governmental approvals or registrations required under law and has

obtained or will obtain all consents necessary to authorize the performance of its obligations under the Program and the Agreement.

**Exhibit 1, AHMSI** *Servicer Participation Agreement,* **at Exhibit A Financial Instrument, p. 2-3 ¶ 5(b).** Homeward has knowingly failed to notify the government as required when its certifications and representations of compliance have been false.

21.     The following certification is included in the Certificates to be executed and delivered to the Government by Homeward, like every Servicer, annually beginning on June 1, 2010, and again on June 1 of each year during the Term of the Agreement, pursuant to Section 1.C of Homeward Servicer Participation Agreement, as well as paragraph 5(b) of their Financial Instruments, which are each incorporated in and part of each of the Servicer Participation Agreement.

## ANNUAL CERTIFICATION

2.     **Servicer is in compliance with [present], and certifies that all Services have been performed [past] in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, 15 USC 1601 § et seq.** [sic], the Home Ownership and Equity Protection Act, 15 USC § 1639, the Federal Trade Commission Act, 15 USC § 41 et seq., the Equal Credit Opportunity Act, 15 USC § 701 et seq., the Fair Credit Reporting Act, 15 USC § 1681 et seq., the Fair Housing **Act and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices** and all applicable laws governing tenant rights.

Exhibit 1, AHMSI *Servicer Participation Agreement,* at Exhibit A Financial Instrument, p. 2 ¶ 5(b) and Exhibit B Annual Certification, p. 2 ¶ 2; *see also* form for annual certification accessible at

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreemen
t.pdf (last accessed January 2, 2014).

22.     Homeward falsely represented that it was in full compliance with the above
requirements with the execution of the Servicer Participation Agreement and the Certification
within that Agreement (Exhibit 1) on July 10, 2009, and in each annual re-certification.

23.     Homeward's representations of compliance with all applicable federal and state
laws were conditions of payment, and material to payment by the United States. Paragraphs 4.A.
to 4.D. of Homeward's Servicer Participation Agreement provide as follows:

> **4.      Agreement to Purchase Financial Instrument; Payment
> of Purchase Price**
>
> **A.      Fannie Mae, in its capacity as a financial agent of the
> United States, agrees to purchase**, and Servicer agrees to
> sell to Fannie Mae, in such capacity, the Financial
> Instrument that is executed and delivered by Servicer to
> Fannie Mae in the form attached hereto as Exhibit A, in
> consideration for the payment by Fannie Mae, as agent, of
> the Purchase Price.
>
> **…**
>
> **B.      Solely in its capacity as the financial agent of the United
> States, and subject to subsection c below, Fannie Mae shall: (i)
> remit compensation payments to Servicer; (ii) remit incentive
> payments to Servicer for the account of Servicer and for the
> credit of borrowers under their respective mortgage loan
> originations; (iii) remit payments to Servicer for the account of
> Investors, in each case in accordance with the Program
> Documentation (all such payments, collectively, the "Purchase
> Price"); all payments remitted to Servicer for the credit of the
> borrowers or for the account of the Investors under the
> Program Documentation shall be applied by Servicer to the
> borrowers' respective mortgage loan obligations, or remitted
> by Servicer to Investors, as required by Program
> Documentation. Fannie Mae shall have no liability to Servicer**

**with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the Program payment structure, including but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.**

C.      The **Purchase Price** will be paid to Servicer by Fannie to Servicer by Fannie Mae as the financial agent of the United States as and when described herein and in the Program Documentation in consideration for the execution and delivery of the Financial Instrument by Servicer on or before the Effective Date of the Agreement, **upon the satisfaction of the conditions precedent** to payment described in subsections A. and B. above.

D.      Solely in its capacity as the financial agent of the United States, and subject to subsection E. below, Fannie Mae shall remit all payments described in the Program Documentation to Servicer for the account or credit of Servicer, Investors and borrowers, in each case in accordance with the Program Documentation (all such payments, collectively, the "Purchase Price"); all payments remitted to Servicer for the credit or account of third parties under the Program Documentation shall be applied by Servicer as required by the Program Documentation. Fannie Mae shall have no liability to Servicer with respect to the payment of the Purchase Price, unless and until: (a) Servicer and all other interested parties have satisfied all pre-requisites set forth herein and in the Program Documentation relating to the applicable Program payment structure, including, but not limited to, the delivery of all data elements required by Section 3 of this Commitment; and (b) the Treasury has provided funds to Fannie Mae for remittance to Servicer, together with written direction to remit the funds to Servicer in accordance with the Program Documentation.

**Exhibit 1, AHMSI *Servicer Participation Agreement* at p. 3 (emphasis added).**

24.     Homeward acknowledged in the **Financial Instrument** purchased by Fannie Mae

pursuant to the Commitment to Purchase Financial Instrument and Servicer Participation

Agreements between Fannie Mae and Homeward that <u>providing false or misleading information</u> to <u>Fannie Mae or Freddie Mac in the HAMP Program</u> may constitute violations of (1) <u>federal criminal laws</u> found in Title 18 of the U. S. Code or of the **civil False Claims Act (31 U.S.C. §§ 3729-33)**:

> (f)     **Servicer acknowledges that the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of: (a) Federal criminal law involving fraud,** conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or **(b) the civil False Claims Act (31 U.S.C. §§ 3729-3733).** Servicer covenants to disclose to Fannie Mae and Freddie Mac any credible evidence, in connection with the Services, that a management official, employee, or contractor of Servicer has committed, or may have committed, a violation of the referenced statutes.

**Exhibit 1, AHMSI** *Servicer Participation Agreement* **at Exhibit A Financial Instrument at p. 3 ¶ 5(f).**

25.     Given the scope of the representations, warranties, and covenants and the Servicer's continuing obligations of truthfulness and accuracy as set forth in the introduction to paragraph 5, Homeward was on notice of the obligations of truthfulness and accuracy and acknowledged that failures to fulfill these obligations could lead to criminal and False Claims Act prosecution:

> **5. <u>Representations, Warranties and Covenants</u>**. Servicer makes the following **representations, warranties and covenants** to Fannie Mae, Freddie Mac and the Treasury, **the truth and accuracy of which are <u>continuing obligations</u> of Servicer**. In the event that any of the representations, warranties, or covenants made herein **ceases to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac <u>immediately</u>**.

**Exhibit 1, AHMSI *Servicer Participation Agreement*, at Exhibit A Financial Instrument, at p. 2 ¶ 5.** Homeward violated the duties under ¶ 5 in a multitude of ways made evident in the violations set forth herein below and with a numerosity that appears to be the rule rather than the exception. Homeward's violations of its many duties, as well as the concealment of those violations, as set forth herein violated, ubiquitously, the conditions precedent to payment.

26.     In 2008, Relator Fisher, who was an employee of a Brea, California law firm, began assisting attorneys there in helping homeowners obtain home loan modifications. Relator Fisher continued this line of work with a Southlake, Texas law firm upon moving to Texas in November of 2010 until his partial retirement in March 2012. Relator Fisher's tasks involved primary responsibility for much of the processing of loan modification applications for the firms' clients. Relator Fisher assisted a number of attorneys in successfully completing hundreds of loan modifications for clients of the two law firms and personally reviewed every one of the modification contracts and applications. Relator Fisher coordinated the modification process with twenty or more different servicers. Additionally, he received and reviewed thousands of modification contracts from other law firms and companies who represented clients for modifications from multiple servicers including Homeward.

27.     Relator Fisher worked with his law firm employers to complete successful Homeward loan modifications for the firms' clients. Relator Fisher reviewed and consulted on the details of each Homeward modification agreement with the clients. As a result, Relator Fisher is aware of all of the Homeward modification agreements between the firms' clients and Homeward, as well as the contents of the files. This includes some modifications submitted under HAMP and non-HAMP modifications. Relator Fisher has also requested and received

copies of additional Homeward HAMP and non-HAMP modification contracts from other firms and has closely examined them all.

## VI. HOMEWARD HAMP AND NON-HAMP LOAN MODIFICATIONS

28.     In connection with modification agreements, at a high level AHSMI operates essentially the same as virtually all servicers who participate in the Government's Making Home Affordable (MHA) – HAMP program. Homeward facilitates and grants modifications under two general kinds of circumstances, as do virtually all servicers. One circumstance involves making modifications under guidelines that are established by the Treasury Department for the Government's HAMP program,[15] and then submitting a claim for payment of incentive fees by the U.S. Government pursuant to HAMP policies. The second area of modifications involves modification of loans that are outside of HAMP wherein the servicer and investors or lenders owning the loans determine the guidelines. On the Non-HAMP-submitted modifications, a servicer does not submit a request for Government payment, but may look to the borrower to compensate the servicer instead.

29.     The two types of modification contracts are usually similar in form and substance. The HAMP modifications generally are more restrictive in requirements for an approval of a permanent modification, and subsequent payment by the U.S. Government. The non-HAMP modifications have more flexibility for approval, and do not have the requirement to be completed within the strict boundaries of the MHA Handbook. Homeward generally uses one of two standard contract formats for modifications to borrowers. One contract format is used for

HAMP-submitted modifications, and another format is used for non-HAMP modifications. Here, Homeward HAMP and non-HAMP modification contracts are similar in form and substance, although its HAMP modifications must meet the HAMP requirements for approval, while its non-HAMP modifications may be more flexible.

30.      In the numerous HAMP and non-HAMP Homeward loan modifications reviewed by Relators, Homeward virtually always loaned new amounts of principal to the borrower by adding them to the original loan principal balance. In modifications reviewed by Relators, the amount of the new, additional loan advances made to borrowers, , above and beyond the principal balance owed prior to the modification, typically amounted to tens of thousands of dollars. The capitalized amount included delinquent interest, property taxes, and various undefined and undisclosed modification fees and costs, not arising out of (i) the original note or (ii) deed of trust. Homeward often capitalized a lump sum without any itemization of the amount financed, making it impossible for the borrower to discern what charges comprised the added principal. On the amounts added to the principal balance, AHSMI charged interest to be repaid over approximately 25 up to 40 years. **Homeward did not, however, provide the required notice of the right of rescission notwithstanding the resulting first lien mortgage retained or acquired in the borrower's principal residence for the deferred debt payment or the additional amount advanced and secured.**

31.      The HAMP modification agreements typically stated:

> *The modified principal balance of my Note **will include** all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding*

> *unpaid late charges, collectively, "Unpaid Amounts") less any*
> *amounts paid to the Lender but not previously credited to my Loan.*

All of these modification contracts with increased indebtedness, capitalized debt, including past due obligations and modification fees and costs not arising under the (i) **original** note or (ii) deed of trust, and the deferral of a large principal payment were secured and finalized without providing the borrowers the legally required notice of the right to rescind. The Homeward HAMP loan modifications reflected new debt balances that were always substantially more than the pre-modification outstanding principal balances on the HAMP modifications reviewed by Relators.

32.    Each relevant Homeward loan modification contract contains the following or substantially similar language:

> If under the Servicer's procedures a title endorsement or subordination agreements are required to ensure that the modified mortgage Loan **retains its first lien position** and is fully enforceable, I understand and agree that the Servicer **will not be obligated or bound to make any modification** of the Loan Documents or to execute the Modification Agreement if the Servicer has not received an acceptable title endorsement and/or subordination agreements from other lien holders, as Servicer determines necessary.

*See, e.g.,* **Exhibit 6 at p. 5, para. J.**

33.    Pursuant to the language quoted in the previous paragraph in Homeward loan modification contracts, Homeward, as the Servicer, *retained* or *acquired* a new, first-lien security interest in the residential real property for its HAMP modification advance. The original first lien securing the original loan obligation was *retained* by the Investor/Note owner. The **new security interest** referenced above secures an obligation to a new lender (Servicer), and the first-

lien security interest now covers a larger loan obligation than the previous loan obligation.[16] Thus, this factually satisfies Section 1026.23, as a security interest is both **retained** (Investor/Note owner) and **acquired** (Servicer advance). 15 U.S.C. § 1635; 12 C.F.R§ 1026.23(a). The new security interest clearly appears to cover the new charge of interest on the newly capitalized advances.

34. Homeward never provided TILA/Regulation Z Right of Rescission notices when making HAMP or proprietary modifications, despite the fact that Homeward's sophisticated real-estate lending lawyers prepared each of the files, and Section 1026.23(a) requires that the notice be provided. 12 C.F.R. § 1026.23(a)-(b).

35. Through January 2015, the United States has paid a total of **$280,490,773.18** in incentives for Homeward HAMP modifications, which includes **$94,832,607.23** for the servicer, Homeward.[17] The balance of the funds was paid for the benefit of the relevant borrowers and investors. *See TARP Housing Transactions Report for Period Ending February 13, 2015*, at **p.46,** Supplemental Information [Not Required by EESA §114(a)] Making Home Affordable Program Non-GSE Incentive Payments (through Jan. 2015).

http://www.treasury.gov/initiatives/financial-stability/reports/Pages/default.aspx

Under "All Reports by Frequency," "As Indicated," click on TARP Housing Transaction

---

[16] In some modifications, AHMSI adds amounts to existing principal balances, and forgives part of the original principal. In these cases, the new loan amount is owed to and a new security interest acquired or retained by a new lender, AHMSI. The amount of principal forgiven is forgiven by the owner/investor; the newly advanced amount loaned by AHMSI is not forgiven and a new security interest in the property is acquired or retained by AHMSI.

[17] The Government's incentives for the benefit of the investor/lenders and borrowers, the other two express beneficiaries, have been paid to AHMSI to be distributed or credited promptly to the appropriate recipient.

Reports" and select the report by date. Therefore, the approximate amount of the Government's False Claims Act damages incurred is **$280,490,773.18 (prior to applying the mandatory trebling provision)**.

36.     The procedure by which Homeward has received the Government-paid incentives for Homeward's loan modifications is as follows:

### MHA Compensation Process

1.      Servicer establishes bank account.

- Bank accounts are designated by the servicer on the HAMP Registration Form, Sections 3 and 4.

- Servicers may designate up to four accounts to allocate compensation appropriately: default, servicer, investor, and borrower accounts.

2.      Servicer submits Official Loan Setup record once trial period is complete.

- Refer to the chart above for compensation timing considerations and requirements.

3.      Fannie Mae, as administrator for the Making Home Affordable Program, provides Cash Payment Summary Report to servicer.

- Report includes compensation amount on a loan-level basis and indicates the associated payor: U.S. Treasury Department, Fannie Mae, or Freddie Mac.

- Report is accessible via the HAMP Reporting Tool one business day before compensation is deposited into accounts. Deposit occurs on the 27th calendar day or first business day prior to the 27th if the 27th falls on a weekend or a holiday.

4.      Deposit is made.

> - Deposit is transferred via the Automated Clearing House (ACH) Network on 27th of the month or on the business day prior to the 27th.

*MHA Compensation Matrix*, dated July 31, 2012 at p. 7. Homeward followed this procedure and generated $**280,490,773.18** in Government incentive payments for the benefit of Homeward, its investor/owners, and its borrowers. ***TARP Housing Transactions Report for Period Ending February 13, 2015***, at p.46.

## VII.   FEDERAL HOUSING ADMINISTRATION ("FHA") VIOLATIONS

37.     The FHA was created by Congress in 1934 and became part of the Department of Housing and Urban Development (HUD) in 1965. The FHA provides mortgage insurance for single-family housing loans to approved lenders to protect them against losses resulting from defaulting borrowers. *See* 12 U.S.C. § 1709; *See generally* 24 C.F.R Part 203. FHA-approved servicers are obligated to comply with all applicable laws and regulations.[18] Those servicers that fail to comply with HUD statutes, regulations, handbook requirements or mortgagee letters may be required to repay incentives received or indemnify HUD for any losses incurred.[19] After April 25, 1996, FHA ceased accepting applications for the assignment of FHA loans which had gone into default, and instead initiated a comprehensive loss mitigation program to provide relief to borrowers in default.[20] The loss mitigation program returned the responsibility for managing loan

---

[18] FHA Commissioner Letter Oct. 8, 2010
[19] *Id.*
[20] *See generally* 24 C.F.R. § 203.605; See also Mortgagee Letter ("ML") 2000-05 ("Loss Mitigation Program-Comprehensive Clarification of Policy and Notice of Procedural Changes") (Jan. 19, 2000), http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs    (last    visited September 2, 2014).

defaults to the servicer and provided financial incentives to recognize them for this effort. Pursuant to HUD regulations and guidance, FHA-approved lenders and their servicers are *required* to engage in loss mitigation to avoid the foreclosure of HUD-insured residential mortgages.[21] Specifically, Mortgagee Letter 2008-27 mandates that in order to avoid the potential assessment of treble damages mortgagees must (1) ensure that the loss mitigation evaluations are completed for all delinquent mortgages before four full monthly installments are due and unpaid, (2) ensure that the appropriate actions are taken based on these evaluations and (3) maintain documentation of all initial and subsequent loss mitigation evaluations and actions taken.[22] Homeward failed all three (3) requirements, and **never reported, as it represented that it would do,** the violations to Fannie Mae; thus, even more federal law violations resulted rendering certifications and representations of compliance with federal laws transparently false.

**A.      Violations of FHA Loss Mitigation Requirements**

38.      To service FHA loans, a servicer must have a fully functioning Quality Control (QC) Program in place to ensure that the required, FHA-compliance procedures are observed and

---

[21] 24 C.F.R. § 203.500 et seq.; ML 2000-05 at p. 6; *see also* ML 2008-27 ("Treble Damages for Failure to Engage in Loss Mitigation") (Sept. 26, 2008) to avoid treble damages, "First, mortgagees must ensure that the loss mitigation evaluations are completed for all delinquent mortgages before four full monthly installments are due and unpaid. Second, mortgagees must ensure that the appropriate action is taken based on these evaluations. Third, mortgagees must maintain documentation of all initial and subsequent loss mitigation evaluations and actions taken."
http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs (last visited September 2, 2014).

[22] See ML 2008-27, http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs (last visited September 2, 2014),
http://portal.hud.gov/hudportal/HUD?src=/program_offices/housing/sfh/nsc/lmmltrs (last visited September 2, 2014).

that personnel working for the lender must understand how to meet the strict FHA requirements. FHA-compliant QC programs and plans provide for and require the correction and reporting of problems and violations to HUD once the lender becomes aware of them. Homeward violated each of these requirements and more.

### 1.      Failure to implement a FHA-compliant Quality Control program

39.      Homeward knowingly failed to establish a compliant QC program for the FHA portfolio. The employees servicing the FHA portfolio did not have a check list, reference guide or instruction manual to assist them in their determination of compliance with current FHA loan modification requirements, nor were they provided adequate training or instructions by management, all of which was **expressly disclosed** to management who decided to do nothing about the clear ongoing violations of these federal laws. The servicer's knowing, material failure to implement an FHA compliant QC program was a direct violation of HUD requirements and rendered each of Homeward's requests for payment, from the FHA insurance fund, a false claim, as well as a violation rendering false Homeward's certifications/representations of compliance with federal law. Thus, Homeward's SPA certifications/representations of legal compliance, initial and sequential annual certifications, were false for these additional reasons.

### 2.      Failure to engage in FHA specific loss mitigation procedures

40.      Likewise, Homeward knowingly and continuously failed to engage in any required FHA loss mitigation practices, as required under HUD. Homeward's practice has long been to treat **all** loan default processes, including FHA loss mitigation, as if they were **conventional loans**; however, HUD developed and required particular processes and procedures

to be used in relation to FHA/VA loans. Therefore, Homeward's standard practice, as recent as April 2013, of applying the same [conventional] loan default processes across the board, was unlawful and it violated HUD's FHA requirements. AHSMI failed to act in good faith and refrain from taking advantage of the FHA. See 24 C.F.R. [section symbol] 203.5(c) (requiring underwriter due diligence exercising "the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment."); 48 Fed. Reg. 11928, 11932 (Mar. 22, 1983 ) (Supplementary Information, asserting in connection with promulgation of substantially identical provisions of former 24 C.F.R. [section symbol] 200.163(b) that due diligence and good faith are owed the insurer not only by regulation but civil law, citing _United States_ v. _Bernstein,_ 533 F.2d 775, 797 (2d Cir.), _cert denied,_ 429 U.S. 998, 97 S. Ct. 523; 50 L. Ed. 2d 608 (1976) (holding that a mortgagee has an affirmative duty "to use due care," and that the scheme of FHA mortgage guaranties presupposes "an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in **good faith** after due consideration of the facts found.")). Thus, in Homeward's SPA and sequential annual certifications, the certifications/representations of Homeward's compliance with federal and state lending laws were false for all of these additional reasons.

41.    In regard to FHA loss mitigation, the FHA Home Affordable Modification Program (FHA HAMP) provides defaulting borrowers a loss mitigation solution that included a Loan Modification with a Partial Claim. The specific guidelines for FHA HAMP are found in a document released by HUD titled, "Making Home Affordable Program: FHA's Home Affordable            Modification            Loss            Mitigation            Option,"

http://www.phillyvip.org/sites/default/files/FHA-HAMP%20Overview%206-2013.pdf      (last

accessed October 16, 2014). The requirements therein specifically require that the FHA loan

modification must be re-amortized to a 30-year fixed rate mortgage in order to qualify for FHA

HAMP. Upon information and belief, Homeward was modifying FHA loans and amortizing the

loan for more than 30 years, which was prohibited by HUD, and recklessly caused the

borrower's disqualification from eligibility in the FHA-HAMP program.

### 3.      Improperly servicing FHA loans off-shore

42.     In addition, the review and underwriting of FHA loan modification packages were

knowingly outsourced overseas to India along with modification applications intended to apply

**to conventional loans, only**, and treated as such in violation of HUD regulations and

guidelines[23.] HUD Handbook 4060.1 allows for the outsourcing of certain administrative and

clerical functions "that do not materially affect underwriting decisions or increase the risk to

FHA," but explicitly **prohibits the outsourcing** of management, underwriting, and loan

origination functions.[24] The FHA modification applications were not distinguished from

conventional loan packages and the offshore company, upon improperly receiving the FHA

documents, applied the same [conventional loan] review criteria to all loans. This reoccurring

violation created a snowball effect which resulted to the severe detriment of delinquent FHA

borrowers. As a result of the FHA loan being reviewed under the wrong criteria, some borrowers

---

[23] HUD Handbook No. 4060.1 REV-2, Ch. 2-13: Outsourcing ("A mortgagee may contract out certain
administrative and clerical functions that do not materially affect underwriting decisions or increase the
risk to FHA…The management, underwriting, and loan origination functions may not be contracted out.")
[24] *Id.*

**Relators' Second Amended Complaint**                                                      **35**

were **wrongfully denied** a FHA-HAMP modification and the loan ultimately proceeded to foreclosure status. Moreover, Homeward was directly responsible for these serious violations committed by the third party contractor by virtue of the Financial Instrument contained in Homeward's SPA. Specifically, the Financial Instrument provides as follows:

> Use of Contractors. **Servicer is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Programs in which Servicer participates**. Servicer shall remove and replace any contractor that fails to perform. Servicer shall ensure that all of its contractors comply with the terms and provisions of the Agreement. <u>**Servicer shall be responsible**</u> **for the acts or omissions of its contractors as if the acts or omissions were by the Servicer** (emphasis added).

Homeward's SPA at Financial Instrument ¶ 6. Homeward's SPA certifications/representations of compliance with federal laws, regulations and requirements were false for these additional violations committed by the third party contractor.

## B.      Homeward's False Certifications

43.      Homeward initially certified/represented its current and historical compliance with, and covenanted that all services would be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices and all applicable laws governing tenant rights.[25] The FHA has paid insurance claims for insured mortgages based on Homeward's false certifications that it was in compliance with all FHA and HUD regulations and had a properly functioning QC program. The

---

[25] See AHMSI *Servicer Participation Agreement* (Exhibit 1) at Exhibit B, Financial Instrument at ¶5.b and Exhibit C, Form of Certification at ¶2.

FHA would not have paid mortgage insurance to Homeward if it had known about Homeward's failures to maintain quality control and abide by FHA loss mitigation requirements within the FHA portfolio.

44.     Specifically, in order to qualify as an FHA-insured lender, Homeward was required to submit an annual certification to HUD.[26] Homeward certified in its annual certification to HUD as follows (in sum and substance):

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

More specifically, the relevant, annual certification was made by Homeward annually from and after the date Homeward was first approved to participate in HUD's Title II Program and able to submit FHA mortgages for FHA insurance endorsement.

45.     In each annual certification, Homeward certified that it had "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with the Department."[27] Absent such a certification, a lender cannot submit a mortgage for FHA insurance endorsement. The FHA paid Homeward insurance claims related to mortgages insured by the FHA based on the false

---

[26] *See* 24 CFR § 202.5; *see also* ML 2009-42 ("Sub-Servicing of FHA-insured Mortgages") (Oct. 19, 2009), available at http://www.hud.gov/offices/adm/hudclips/letters/mortgagee/2009ml.cfm (last accessed November 12, 2014) ("As a reminder, the servicing of FHA-insured loans must be performed by a mortgagee that is approved by FHA pursuant to FHA guidelines. See 24 CFR §§202.5 and 203.502.").
[27] *See* HUD Mortgagee Letter 2009-25 and the sample Annual Certification attached thereto, available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/letters/mortgagee/2009ml.

certification that it had complied with all HUD-FHA regulations, including any servicing requirements. Undoubtedly, the FHA would not have made a financial commitment to reimburse Homeward for such mortgage insurance if it had known Homeward's non-compliance with HUD-FHA rules and regulations.

45.     Homeward's cumulative FHA loss mitigation violations were material to the United States. Thus, the initial and annual SPA certifications/representations executed by Homeward, that it was "in compliance with all applicable Federal, state and local laws, regulations…requirements…and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices….", were **knowingly false** for all of these additional reasons. Homeward knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. 3729(a)(1)(A). Furthermore, Homeward knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim that was material to the United States' decision to pay insurance claims for insured mortgages in violation of 31 U.S.C. § 3729(a)(1)(B). These false statements/certifications fraudulently induced the United States to make insurance claim payments from the FHA insurance fund, based upon the belief that Homeward's certifications/representations of compliance with all FHA and HUD regulations were true when they were, in fact, not true. Therefore, Homeward (and OFC) is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim under 31 U.S.C. §§ 3729(a)(1)(G).

## VIII. UNFAIR, DECEPTIVE OR ABUSIVE ACTS OR PRACTICES

46.     The Home Affordable Modification Program's instructions to servicers explicitly and prominently state that "Lenders MUST revise the [Home Affordable Modification Agreement] . . . as necessary to comply with applicable federal, state and local law."[28] Homeward failed to make such required revisions.

## A.     UDAAP and UDAP

47.     The Dodd-Frank Act prohibits unfair, deceptive, or abusive acts or practices (UDAAP). In addition, some state laws contain broad prohibitions on unfair and deceptive acts and practices (UDAP). Others contain only specific prohibitions on clearly specified activities. And, some state laws exclude creditors from coverage.[29] Thus, the extent to which Homeward violated state UDAP laws will vary based on the peculiarities of each state's law, but Homeward did violate federal (UDAAP) and state (UDAP) laws, thus triggering FCA violations by falsely certifying compliance with those statutes.

48.     A number of the terms (and omitted terms) in the loan modification agreements raise potential UDAAP and UDAP violations:

1. <u>Homeward</u>. As a result of an extended amortization schedule created a monthly shortage of fully paying down the principal each month that continued to accrue interest and created a large Balloon Payment due.

---

[28] Home Affordable Modification Agreement—Document Summary for non-GSE Loans (for use with Form 3157) (available at https://www.hmpadmin.com/portal/programs/hamp.jsp). This language reveals that the model HAMP forms establish a floor not a ceiling. In other words, AHMSI is not immunized from liability because it used the model forms. Rather, the HAMP instructions make clear that AHMSI was required to go beyond the requirements of the model forms if necessary to comply with federal, state and local law.
[29] *See generally,* Carolyn L. Carter, <u>Consumer Protection in the States</u> (National Consumer Law Center, February 2009).

Although there are two references to the deferred principal, Homeward did not include the deferred principal amount due in the payment schedules box it provided borrowers. Instead, the payment schedules show how much borrowers will pay in principal and interest during different time periods, but not the final Balloon payment that will be due as required by law. Balloon payments due at maturity were not included in the box payment schedule chart as required by law.

2. In the HAMP Loan Modification Agreements Homeward failed to provide the borrowers with the then current principal balance of their loans, which impeded their ability to make meaningful comparisons among their principal balance, their adjusted principal balances, and the payments they would have to make at maturity. This information could have been valuable in their evaluation whether to agree to AHSMI's unilateral demands for the loan modifications. In addition, without this information, the borrowers could not determine whether Homeward's representations of their principal balance were correct.

3. In virtually all HAMP loan modifications Homeward failed to break down the amounts it had advanced for fees, costs, taxes, insurance and interest. These omissions prevented borrowers from ascertaining whether Homeward's numbers were correct and/or acceptable.

4. Many of the modifications had interest rates that increased over time. It is a fair assumption that the lower initial interest rates was necessary for the loans to be affordable. If borrowers could not afford the loans at higher interest rates at the time of the modification, there was no valid, objective evidence that they would be able to afford the higher interest rates in a few years.

5. The modifications that Homeward provided borrowers depended on home values rising. This is the same misguided assumption that banks made a few years back and that led to the financial crisis that resulted in many people defaulting on their loans. Moreover, while some areas might experience increasing housing values, others might experience little or none depending on many factors over which the borrowers had no control.

6. Homeward provided only temporary relief to many borrowers, the effect of which was to postpone foreclosures, not to facilitate people keeping their homes. The loan modifications, with their deferred principal and balloon payments were not affordable, by any objective evidence, in the long-term. By the maturity date of the loans, some of the borrowers would

likely be too old to be eligible to obtain a loan to refinance their homes to pay off the balloon and deferred principal payments. And, even if they were not too old, they might not have enough equity or sufficient income to refinance.

7.  On HAMP loan modifications AHMSI/Homeward failed to provide any specific detail or itemization of the additional amounts added to the principal balance. Instead the borrower was only informed of the new principal balance and was not provided any meaningful details of the separate charges added to constitute the new principal balance. This information would have been valuable in the consumer's evaluation of whether or not to accept Homeward's unilateral modification terms and conditions. As important, without this information, the borrowers could not determine whether Homeward's representations of the new principal balance were correct in Homeward's "take it or leave it" modification agreement.

8.  On both HAMP and non-HAMP loan modifications Homeward at times extended the amortization schedule beyond the loan term creating a **large Balloon Payment** due at the term of the loans. At no time in any of the loan modifications (HAMP or non-HAMP) did Homeward properly inform the borrower as to the shortage amount of each payment under the modified payment under the agreement that would be short for the amount required to pay down the principal by the maturity of the loan term. Homeward did not provide a full and complete explanation or disclosure that the amortization extension was the cause of the monthly principal payment shortage. Homeward fails to properly provide disclosure that the monthly principal shortage is accruing interest over the term of the loan, and that this structure would create a large Balloon Payment due at the maturity of the loan term.

See *infra* at ¶¶ 117, 126, 133.

## B.    DODD-FRANK ACT

49.    The CFPB is still shaping the contours of Dodd-Frank's prohibitions on unfair,

deceptive and abusive acts or practices, relying in large part on interpretations the FTC and the

courts have given to prohibitions on unfair or deceptive acts or practices under the FTC Act.[30]

All of the preceding and subsequent allegations herein regarding Homeward's servicing

misconduct are **incorporated herein** as if specifically re-alleged.

The Dodd-Frank Act[31] makes it:

unlawful for (1) any covered person or service provider--

(A) to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law; or

(B) to engage in any unfair, deceptive, or abusive act or practice."[32]

50.     A covered person is "any person that engages in offering or providing a consumer

financial product or service."[33] A consumer financial product or service includes extending

credit.[34] Homeward meets the definition of a covered person and the loan modification

agreements are consumer financial products for the reasons previously discussed.

**1.  Unfair**

51.     Unfairness is defined as an act or practice that:

(A)      . . . causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

(B)      such substantial injury is not outweighed by countervailing benefits to consumers or to competition."[35]

---

[30] 15 U.S.C.A. § 45(a)(1) (2006).
[31] The Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat., 1376-2223 (July 21, 2010).
[32] 12 U.S.C.A. § 5536(a)(1) (2010).
[33] 12 U.S.C.A. § 5481(6) (2010).
[34] 12 U.S.C.A. § 5481(5) and (15)(A)(1) (2010).
[35] 12 U.S.C.A. § § 5531(c)(1) (2010).

The unfairness provision further states that "in determining whether an act or practice is unfair, the Bureau may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination."[36]

52.     Applying these elements to the Homeward loan modifications, the likelihood that borrowers will lose their homes at the end of the maturity periods or when their interest rates go up is a substantial injury.

53.     In its Supervision and Examination Manual, the CFPB has put some flesh on the second element-- that consumers are not reasonably able to avoid the injury. The critical inquiry is whether "material information about a product, such as pricing . . . is withheld until after the consumer has committed to purchasing the product. . . . The question is whether an act or practice hinders a consumer's decision-making. For example, not having access to important information could prevent consumers from comparing available alternatives, choosing those that are most desirable to them, and avoiding those that are inadequate or unsatisfactory."[37]

54.     The Homeward modifications obscured and excluded material information about the loan modifications by excluding the amount of the deferred principal from the payment schedules, by not including the principal balance so the borrowers could meaningfully compare their options, by not providing borrowers with information from which they could assess the accuracy of Homeward's figures, and by not making clear that Homeward was under no

---

[36] 12 U.S.C.A. § § 5531(c)(2) (2010).
[37] CFPB Supervision and Examination Manual, version 2 (October 2012), p. UDAAP 2, citing the FTC Policy Statement on Deception (available at http://www.ftc.gov/bcp/policystmt/ad-decept.htm).

obligation to refinance their balloon and deferred principal payments. These omissions impeded borrowers' ability to weigh their options with full information.[38]

55.    Obscuring the terms of the modifications does not benefit competition or consumers. To the extent that public policy is a consideration, numerous laws and judicial decisions have established that informed consumer choice is a value that the law should support.

## 2.  Deceptive

56.    Although the Dodd-Frank Act does not define the term deceptive, the CFPB Supervision and Examination Manual states that a representation or omission is deceptive if:

> (1) the representation, omission, act, or practice misleads or is likely to mislead the consumer;

> (2) the consumer's interpretation of the representation, omission, act, or practice is reasonable under the circumstances; and

> (3) the misleading representation, omission, act, or practice is material.[39]

57.    The feature of the loan modifications that falls most squarely under the deception prong is the omission of the deferred principal amounts from the payment schedules. Again, the CFPB Manual provides guidance: "Oral or fine print disclosures or contract disclosures may be insufficient to cure a misleading headline or a prominent written representation . . . . Acts or practices that may be deceptive include: making misleading cost or price claims."[40] The payment schedules are prominent in the loan modification agreements and give the impression that they reflect the true cost of the loan modifications even though the fine print indicates otherwise.

---

[38] See *infra* at ¶¶ 117, 126, 133.
[39] *Id.* at p. UDAAP 5.
[40] *Id.*

58.      The CFPB cites to the FTC's "four Ps" test for determining whether a statement is or is likely to be misleading. The test focuses on the prominence of the statement, whether the statement is presented in a format consumers can understand, whether the information is in a place consumers would look, and "whether the information is in close proximity to the claim it qualifies."[41] The critical language about the date for paying the deferred principal is not prominent nor is it in close proximity to the payment schedule, which it, in effect, qualifies.

59.      The focus of the second element takes into account the target audience. The question is: how would reasonable people who are financially distressed interpret the payment schedule? If "a significant minority" of such people would find the schedule misleading, this element is satisfied.[42]

60.      Finally, the last element is satisfied because deferred principal of tens and even hundreds of thousands of dollars is material to consumers' choices.

### 3.  Abusive

61.      An abusive act or practice is one that:

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of--

(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

(B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

---

[41] *Id*. at p. UDAAP 5-6.
[42] *Id* at 6.

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer.[43]

62.     Abusive acts and practices are not well-defined because abusive is a new addition to the traditional UDAP coverage. It appears that the CFPB has not yet provided any explicit final guidance on the parameters of the prohibition. With that in mind, the same provisions and omissions that would support an unfairness claim would satisfy the first of the two categories of abusive acts and practices. *Supra*, ¶¶ 51-55.

**C.     "In-Flight" Modifications**

63.     Commonly known in the industry as "In-Flight" modifications, these are loan modifications that are already in progress, and often have been approved, when the servicing rights of the loan are sold to another financial institution. Often, when Homeward was the recipient of in-flight modifications, Homeward would receive only a portion of a borrower's loan file (i.e. the transferee failed to send some of the documents to Homeward) resulting in an incomplete modification package. When the borrowers believed that they had been approved for a loan modification by the transferor bank, they would begin or continue, as the case may be, to make the adjusted modification payments to Homeward. Homeward treated the borrower's payment as short or delinquent, because the transferred file was incomplete and Homeward either couldn't find or didn't have the record of the loan modification. Despite identifying the issue, Often, Homeward knowingly failed to offer alternative modification options to these borrowers who had properly completed and approved the modification packages, resulting in many borrowers being wrongfully forced into foreclosure.

---

[43] 12 U.S.C.A. § § 5531(d) (2010).

64.     Borrower's in-flight modifications were often not being honored by Homeward, even though it was determined that the borrower was eligible for modification and relief should have been extended to the borrower to avoid adverse credit reports and even foreclosure. Homeward's knowing course of conduct caused "substantial injury to consumers," violated the Dodd-Frank Act and the UDAAP/UDAP provisions. These additional federal violations are additional reasons that Homeward' SPA-related representations/certifications of compliance were false each time they were provided to the United States

**D.      Loss Mitigation – Modification Delays and Denials**

65.     In addition to violations contained in the terms (and omitted terms) of the modification agreements, **Homeward's handling of the modification agreements, themselves, amounted to unfair, deceptive and abusive acts and practices**. It was a common practice of Homeward, after borrowers sought loss mitigation assistance, to delay implementation of the borrower's modification agreement by causing the borrower (or their legal counsel) to **repeatedly have to submit the same documentation several times**. The practice was intended by Homeward to frustrate the loss mitigation process. Some borrowers suffered as many as five to six submissions over a period as long as nine to twelve months, and at times, longer. Virtually every client Relator assisted in seeking a modification had experience with Homeward's demands for multiple submissions of documents *previously provided* to the servicer.

66.     In Relator's attempt to coordinate modifications with Homeward**,** the servicer made pre-textual, selective demands for specific loan documents that the Relator's law firm, had already provided to Homeward. Typically, **Homeward either claimed that the entire package was not received, or that the delay of the review had now taken so long that it required a**

**new financial package in order to render a final decision on the modification review**. Even when new, time-sensitive documents were received from the borrower, a delay in the review process would continue because financials were not provided in a timely manner to underwriting to complete the review. Most of the fault for untimely failures to process modification packages was solely because of Homeward's improper staffing at all levels: insufficient employees with proper training, experience, education and a lack of any management guidance on how to properly perform the modification process in conformance with federal and state laws. It was not uncommon for this scenario to play out multiple times in a single borrower's modification process (or attempted modification process), and each time Homeward requested new documentation the entire process had to begin anew. Often, the delay for a borrower to receive a final decision was as long as 12 months or more, with a 9-12 months wait considered average. Upon information and belief, often when a loan modification package became outdated, Homeward would simply deny the modification based on missing documents when in fact that was untrue. Upon information and belief, Homeward recognized that handling files in this manner would drive down pipeline numbers in order to pre-textually appear to be trying to comply with modification regulations and rules, in order to ear "completion credits, and to simply keep their jobs, respectively." The indifference demonstrated by Homeward could not be the result of oversight, as Relator and the law firm he was assisting followed the document trail each time for the borrowers and often failed to receive a credible response from Homeward as to the delay. These additional federal violations are additional reasons that Homeward' SPA-related representations/certifications of compliance were false each time they were provided to the United States.

67.     For those borrowers who were enrolled in a trial period plan for HAMP or non-HAMP modifications, this process, of making redundant demands for loan documentation already submitted, **was especially detrimental**. Homeward provided no training for its loss mitigation employees at intake to properly identify borrowers who were both (1) eligible and (2) had a qualifying loan. This initial incompetency caused a ripple of errors. When the final decision on whether to offer a loan modification was eventually rendered, and the decision was a denial, wherein the process had taken six to twelve months. During that time, the borrower had sent each month the agreed, lesser trial payment. **Once the denial was determined, Homeward then demanded the immediate payment of *all amounts past due*** – meaning the difference between the lesser, modified trial payment amount and the full payment amount contained in the original contract. This amount, often equaling thousands of dollars, was required by Homeward to be made up within thirty days or the borrower was forced into foreclosure, which occurred with regularity, as the borrowers were usually under severe personal and financial distress, unable to pay the fatal "denial penalty."

**E.     Unlawful Failure to Suspend Foreclosure**

68.     Perhaps most egregiously, Homeward **systematically failed to suspend foreclosure proceedings** for those borrowers for whom a loan modification was in review and process. Relator Bullock has confirmed that Homeward routinely failed to halt foreclosure proceedings when the borrower was pursuing and Homeward was considering a loan modification. Homeward continued the foreclosure process, all the while increasing fees and costs to the borrower, including attorney's fees and foreclosure fees. Homeward routinely allowed borrowers' homes to proceed to foreclosure while bona fide, complete, possibly

qualified modification applications went unreviewed. These additional federal violations are additional reasons that Homeward' SPA-related representations/certifications of compliance with federal laws, regulations and requirements were false each time they were provided to the United States.

69.     Aside from engaging in tactical delays designed to force delinquent borrowers into foreclosure, in order to reduce the bottleneck in the loan modifications pipeline, and avoid agency conflict, Homeward regularly engaged in the following harmful and unlawful behavior, violating loss mitigation standards:

a) **Woefully inadequate staffing to accomplish goals of all the departments involved in the modification process forcing delays and incompetence at every level of the process. The inadequate staffing was compounded by the lack of training, education and experience of those hired, all of which was objectively known by the highest management.**

b) **Improper efforts and performance of modification underwriting;**

c) **Failure to establish adequate loan modification procedures;**

d) **Misplacing and failing to properly store loan modification documents;**

e) **Wrongful, fraudulent denial of otherwise qualified modification applications;**

f) **Providing false/misleading information to borrowers regarding the status of loss mitigation review;**

g) **Not responding timely to borrower inquiries;**

h) **Improper calculations of borrowers' eligibility for loan modifications;**

i) **Knowing wrongful denial of loan modifications;**

j) **Improper processing of modification applications, leading to denial; and**

k) **Off-shore loan underwriting and reviews by persons unqualified to perform such tasks who were often uninformed of federal agency**

**modification requirements often resulting in wrongful and fraudulent denials of modifications to borrowers.**

Thus, Homeward's certifications/representations of compliance in its initial SPA, and sequential annual certifications, all of which were and are **express conditions of payment** under HAMP, were false for all of these additional reasons. More violations will likely be discovered during the discovery process. These additional violations will be added to the pleadings by an amendment to conform to the evidence.

70.     Homeward's employees complained to management about default process issues and on-going violations of loss mitigation standards, but management disregarded the warnings and did nothing to remediate pervasive violations. The Vice President for GSE loans expressly raised loss mitigation deficiencies and default servicing violations to management, but his warnings were disregarded, and he objectively fell out of favor with management immediately thereafter.

## IX.     REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)

71.     RESPA is a consumer protection statute that provides certain rights regarding the servicing of mortgage loans and escrow accounts.[44] Section 2605 states that prior to a loan transfer, it is the responsibility of the transferor servicer to notify the borrower in writing, fifteen (15) days before the effective date of the transfer.[45] The transferee receiving servicing rights to a loan must notify the borrower within fifteen (15) days after the effective date of the transfer of

---

[44] 12 U.S.C. §§ 2601-2617.
[45] 12 U.S.C. § 2605(a) and § 2605(b)(1)-(2)(A).

the servicing of the mortgage loan. [46]

72.     In addition, RESPA requires that a servicer of a federally related mortgage **may not:**

      A.  obtain force-placed hazard insurance to maintain property insurance;

      B.  charge fees for responding to valid qualified written requests under this section;

      C.  <u>fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties;</u>

      D.  fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan; or

      E.  fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter. [47]

Homeward retained servicing rights in connection with certain mergers and/or purchases of a competitor's loan portfolio (MSRs). In turn, Homeward was responsible for the timely notification of these transfers to the respective borrowers. Homeward violated the above legal requirements, and these additional reasons made the SPA-related certifications/representations to the United States false, thus fraudulently inducing the government to commence and continue the SPA incentive structure with Homeward.

**A.     Untimely Transferee/Transferor Letters to Borrowers**

---

[46] 12 U.S.C. § 2605(c)(1)-(2)(A).
[47] 12 U.S.C. § 2605(k)(1)(A)-(E).

73.     According to RESPA, borrowers must receive notice of the transfer of their loan to a new servicer within fifteen (15) days. Homeward knowingly failed to timely transmit notices commonly known as "hello" letters to the borrowers in violation of RESPA.[48] This confused the borrower who then sent payment to the wrong servicer **and thereby became delinquent <u>at no fault of the borrowers.</u>**

> If the transferor (rather than the transferee servicer that should properly receive payment on the loan) receives payment on or before the applicable due date (including any grace period allowed under the loan documents), a late fee may not be imposed on the borrower with respect to that payment. Moreover, the payment may not be treated as late for any other purposes. 12 C.F.R. § 1024.21(d)(5)

74.     In many instances, the borrower would send payment to the transferor, due to the untimely transferee letter, and Homeward would improperly charge the unwitting borrower a late fee and send a negative report to the CRAs at a time when the borrowers were **current on their loan**. This all occurred within the first 60 days of the transfer. This knowing and reckless conduct resulted in the detriment of the borrowers as described above and constituted additional violations of federal and state laws, regulations and requirement thus making Homeward's certifications/representations of compliance under SPA false each time they were provided to the United States.

## B.     Additional Violations of RESPA

75.     Homeward's course of conduct with regard to (1) "In-Flight Modifications" as described at ¶¶ 60-61, is a violation of RESPA. 12 U.S.C. § 1024.38.[49] A transferee servicer such as Homeward must have policies and procedures reasonably designed to ensure, in connection

---

[48] 12 U.S.C. § 2605(a).
[49] 12 USC § 2605(k)(1)(C).

with a servicing transfer, that the transferee servicer receives information regarding any loss mitigation discussions with a borrower, including any copies of loss mitigation agreements. Further, the transferee servicer's policies and procedures must address obtaining any such missing information or documents from a transferor servicer before attempting to obtain such information from a borrower.[50]

76.     The transfers were carried out in such a way that many incomplete files were sent to the transferee and were missing important documents, such as the original mortgage contract and often a recently approved modification. Homeward knowingly failed, by improperly staffing and failing to properly train its employees, to implement policies to assist borrowers in connection with a servicing transfer. This knowing and reckless conduct was detrimental to the borrower as described above. Homeward failed to timely respond to complaints regarding the misappropriation of mortgage payment funds due to the failure to properly notify the borrower of a transfer in a timely manner and timely reviewing and confirming the modified terms. Homeward repeatedly violated the above legal requirements, and these additional violations render Homeward' cumulative representations/certifications of federal and state legal compliance to the United States false.

## X. TRUTH IN LENDING ACT AND REGULATION Z

77.     The federal Truth in Lending Act ("TILA") is contained in Title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq.* TILA was enacted "to

---

[50] 12 U.S.C. § 1024.38(b)(4). See also Official Bureau Interpretations ¶ 38(b)(4)(ii) Compliance with the commentary issued by the BCFP affords protection from liability under § 19(b) of RESPA, 12 U.S.C. 2617(b)

assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a).

78.    15 U.S.C. § 1604 authorizes the Consumer Financial Protection Bureau ("CFPB" or "Bureau")[51] to promulgate regulations to carry out the purposes of TILA, which may contain "additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." 15 U.S.C. § 1604(a). The Bureau's rulemaking and interpretive authority are thus expansive and entitled to substantial deference.

79.    Regulation Z, 12 C.F.R. 1026.1 *et seq.* was promulgated by the Board of Governors of the Federal Reserve System ("Board") to implement TILA and other federal consumer protection statutes pursuant to authority granted in several sections, including, primarily, section 105 of TILA, 15 U.S.C. § 1604. *See* 12 C.F.R. 1026.1(a).[52] The provisions relevant to this action are contained in the first two of TILA's five sections, captioned "General Provisions," and "Credit Transactions."

---

[51] This rulemaking authority was originally vested in the Board of Governors of the Federal Reserve System ("Board"). Effective July 21, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new Consumer Financial Protection Bureau ("CFPB" or "Bureau"). Dodd-Frank § 1100A.

[52] Since Dodd-Frank, P.L. 111-203, 124 Stat. 1376, shifted the TILA rulemaking and interpretative authority from the Board to the new CFPB, effective July 21, 2011, Dodd-Frank § 1100A, Regulation Z, previously published at 12 C.F.R. 226, has been republished at 12 C.F.R 1026.

80.     The scope of TILA is so broad that it does not contain a general statement of what transactions are covered but instead specifies what transactions are <u>excluded from coverage.</u> See 15 U.S.C. § 1603, titled "Exempted transactions." Federal courts have held that "'exceptions' not mentioned in TILA should not lightly be read into it." *E.g., Thomas v. Myers-Dickson Furniture Co.*, 479 F.2d 740, 745 (5th Cir. 1973). TILA also affirmatively specifies coverage as to some transactions, including, *inter alia*, exceptions to exceptions from coverage. Although the original bill passed by the Senate did not cover mortgage lending, the final version of TILA passed by Congress included <u>all real property transactions</u>, unless specifically exempted. 4-37A Powell on Real Property § 37A.01[1][a].

81.     TILA delineates its broad scope by specifying *who* must comply with its provisions. Specifically, TILA provides that "creditors" are required to comply and provides that **"Creditor"**

> refers only to **a person who both (1) regularly extends, whether in connection with loans,** sales of property or services, or otherwise, **consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge[53] is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness** or, if there is no such evidence of indebtedness, by agreement. . . . Any person who originates 2 or more mortgages referred to in subsection (aa) [current subsection (bb)][54] in any 12-

---

[53] Regulation Z defines "finance charge" at 12 C.F.R. § 1026.4.

[54] A "mortgage[ ] referred to in Subsection (aa) [current subsection (bb)]" refers to certain high-cost mortgages with high interest rates in comparison with the yield on Treasury securities, or high points and fees payable at or before closing, 15 U.S.C. §§ 1602(bb)(1), 1602(4), (2), (3), 1605(e), secured by the consumer's principal dwelling, other than purchase money or construction financing loans ("residential mortgage transactions," 15 U.S.C. § 1602(x), (w); 12 C.F.R § 1026.2(a)(19), (24); *cf.,* 15 U.S.C. § 1602[(dd)] (cc) (**"Residential mortgage loan" refers to credit transactions secured by mortgage on a dwelling other than purchase money or construction financing loans**.)).

> month period or any person who originates 1 or more such mortgages through a
> mortgage broker shall be considered to be a creditor for purposes of this title . . . .

15 U.S.C. § 1602(g). Under TILA,

> (f) The term **"credit"** means **the right granted by a creditor to a debtor [1] to
> defer payment of debt or [2] to incur debt and defer its payment**.

15 U.S.C. § 1602(f) (emphasis added). Both events constitute an extension of credit. Virtually

100% of the HAMP modifications deferred the payment of debt, and most involved the

incurrence of additional debt and the deferral of payment.

82.     Section 1635 of TILA, 15 U.S.C. § 1635, requires notice of the borrower's right

to rescind consumer credit transactions in which a <u>security interest is retained or acquired</u> in

property that will be the borrower's principal dwelling, until midnight of the third business day

after consummation of the transaction or delivery of the TILA rescission forms, whichever is

later. 12 U.S.C. § 1635(a). In 100% of Homeward's HAMP or proprietary modifications, a

"security interest is retained." In virtually 100% of the HAMP modifications, Homeward

advances to the borrower were expressly conditioned on the advance being covered by a first lien

security interest that Homeward acquired through the credit extension under the HAMP

modification. Thus, a security interest was both (1) retained (Note Owner) and (2) acquired

(Servicer). Written acknowledgement of *any* required TILA disclosure creates only a rebuttable

presumption of delivery. 15 U.S.C. § 1635(c). <u>Refinancings</u> *with no new advances, by the same*

*creditor and secured by the same property*, and certain other transactions are exempted from the

rescission provisions. 15 U.S.C. § 1635(e). The actionable conduct alleged herein involves

transactions which were <u>not refinancings and not otherwise exempted</u> from the rescission

provisions.

**Relators' Second Amended Complaint**                                                                57

83.     Knowing  and  willful  violations  of  TILA  are  subject  to  criminal  penalties including fines and imprisonment. 15 U.S.C. § 1611.

84.     Consistent with the Act, Regulation Z specifies that its scope extends in general:

> To each individual or business that offers or extends credit . . . when four conditions are met:
>
> (i)      The credit is offered or extended to consumers;
> (ii)     The offering or extension of credit is done regularly;…
> (iii)    The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and
> (iv)     The credit is primarily for personal, family, or household purposes.

12 C.F.R. 1026.1(c)(1).

85.     Regulation  Z  provides  tests  for  determining  whether  one  is  a  **"Creditor,"** including in relevant part:

> (17) Creditor means:
>
> (i) **A person who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments (not including a down payment), and to whom the obligation is initially payable, either on the face of the note or contract,** or by agreement when there is no note or contract.
> . . .
>
> (v) **A person regularly extends consumer credit only if it extended credit** (other than credit subject to the requirements of § 1026.32) more than 25 times (or **more than 5 times for transactions secured by a dwelling) in the preceding calendar year.** If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 1026.32 or one or more such credit extensions through a mortgage broker.

12 C.F.R. 1026.2(a)(17). If the obligation is initially payable to one person, that person is the creditor. 12 C.F.R. § 1026, Supp. I, Comment 2(a)(17)(i)2.

86.     **Credit** means the right to defer payment of debt or to incur debt and defer its payment. 12 C.F.R. 1026.2(a)(14).

87.     **Consumer credit** means credit offered or extended to a consumer primarily for personal, family, or household purposes. 12 C.F.R. 1026.2(a)(12). The statute does not define "**transaction,**" "**credit transaction,**" or "**consumer credit transaction,**" although it defines "consumer" and "credit." In a fairly recent case of "first impression," the Court of Appeals for the Fourth Circuit held that for purposes of the right to rescind under TILA—notice of which is the focal point of this action—a course of dealing between parties must be consummated—must be a "consummated event"—to constitute a transaction giving rise to the right to rescind. *Weintraub v. Quicken Loans, Inc.,* 594 F.3d 270 (4th Cir. 2010). Relying on cases regarding the definition of "credit transaction" in automobile sales, the definitions of "residential mortgage transaction," 15 U.S.C. § 1602(w), and "reverse mortgage transaction," 15 U.S.C. § 1602(bb), a *Black's Law Dictionary* definition of "transaction" in the business context, and "a common sense reading of the text of § 1635(a)," the court of appeals concluded that a "credit transaction" occurs when (and that it cannot occur until) "credit is in fact extended"—nothing more is required. 594 F.3d at 274-76. The court of appeals further pointed out that under the regulation implementing the right of rescission, a transaction arises when a security interest has been retained. *Id.* at 276. The court further concluded that the plaintiffs' **deposit agreement with the**

lender pursuant to which the plaintiff paid a $500 fee "**was undoubtedly a 'transaction,'**" although not a *credit* transaction. *Id.*

88.     **Consummation** means the time that a consumer becomes contractually obligated on a credit transaction. 12 C.F.R. 1026.2(a)(13).

89.     Regulation Z specifies that a **"residential mortgage transaction"**

> means a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained in the consumer's principal dwelling to finance *the acquisition* or *initial construction* of that dwelling.

12 C.F.R. § 1026.2(a)(24) (emphasis added). According to the Commentary to the § 1026.2(a)(24) definition of "Residential mortgage transaction," a transaction is *not "to finance the acquisition"* of the consumer's principal dwelling if the consumer has previously purchased and acquired some title to the dwelling, even if not full legal title. 12 C.F.R. § 1026, Supp. I, Comment 2(a)(24)5.

90.     In most credit transactions in which a security interest is acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to a security interest has a **right to rescind the transaction**. 15 U.S.C. § 1635; 12 C.F.R. § 1026.23(a) (other than "residential mortgage transactions," defined at 12 C.F.R. § 1026.2(a)(24) as a transaction to finance the initial acquisition or construction of a dwelling, whether the dwelling is real or personal property, 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-1; *see also* 122 C.F.R. 1026, Supp. I, Comment 1026.23(a)). *Refinancing  or  consolidation  by  the  same  creditor  of  an extension of credit already secured by the consumer's principal dwelling is exempt from the right  to  rescind.  See Arnold  v.  W.D.L.  Investments,  Inc.*, 703 F.2d 848 (5th Cir. 1983). A

**refinancing** occurs when the original obligation is <u>satisfied or extinguished and replaced</u>. 12 C.F.R. § 1026.20, & Supp. I, Comment 1026.20(a)-1. ***This exemption, in Section 1026.23(f)(2), applies only to <u>refinancings</u> or <u>a consolidation by the original creditor; if new money is advanced, however, the amount of the new money is rescindable</u>.*** For purposes of rescission, a new advance does not include amounts attributed solely to the costs of refinancing. 12 C.F.R. § 1026, Supp. I, Comment 1026.23(f)-4. None of the HAMP modifications were refinancings or consolidations under Section 1026.23(f), which requires that the previous debt be paid and replaced by a new debt to constitute a refinancing.

91.     In any transaction subject to rescission, the creditor must give the consumer two copies of a notice of right to rescind, which must be a separate document <u>clearly and conspicuously</u> disclosing the rights and process of rescission. 12 C.F.R. § 1026.23(b). Unless the consumer waives the right to rescind, which is permitted only in limited circumstances, no money shall be disbursed, other than in escrow, no services shall be performed, and no materials shall be delivered unless and until the three-day period passes without the right of rescission being exercised. 12 C.F.R. § 1026.23(c).

## XI. STATE LAWS AND REGULATIONS

92.     Homeward certified that it is in compliance with "all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements, including, but not limited to, the Truth in Lending Act, . . . and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices," Exhibit 1, Homeward *Servicer Participation Agreement*. Homeward's failure to follow state laws are relevant to the falsity of Homeward's initial SPA certification/representation made (1) to induce the government

to approve the SPA and (2) to purchase the Financial Instrument attendant thereto. The sequential, annual certifications/representations required by the SPA falsely certified compliance with relevant state laws in violation of HAMP.

93.     Homeward has modified Texas home equity loans and purchase money mortgages without, when required, complying with Tex. Const. Art. XVI, § 50(a)(6). Homeward has sometimes added tens of thousands of dollars to the principal balance, far in excess of the original notes and of constitutional reasonable closing costs. 7 Tex. Admin. Code § 153.14(2)(B). Similarly, Homeward imposed **new legal obligations** of charging the borrowers interest on interest [as new capitalized principal] through the modification process, an obligation not arising from the **original note** or deed of trust. The evidence proves that Homeward pervasively violated many Texas constitutional legal requirements that protect homesteads in Texas, thus making its certification/representation of compliance with state [Texas] laws and regulations in the initial SPA, and in sequential, annual recertification, a false certification/representation that, at various time, either (1) fraudulently induced the U.S. to approve the SPA or (2) violated a condition of payment to the U.S. under the SPA and the Financial Instrument.

94.     New York Regulation 3 NYCRR § 419.11 states that Servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable**" for borrowers, and prevent foreclosure. Second, Servicers are required to provide borrowers with **written disclosures** that clearly state the "**material terms, costs and risks**." 3 NYCRR 419.11(b) and (d). The evidence proves that Homeward pervasively violated both New York provisions, thus

making its certification of compliance with state [New York] laws and regulations in the initial SPA, and each year thereafter, a false certification/representation, at various times, either (1) fraudulently induced the U.S. to approve the SPA or (2) violated a condition of payment to the U.S. under the SPA and the Financial Instrument.

95.     The state of Massachusetts also has stringent requirements for Servicers. The Code of Massachusetts' Regulations mandates that a third-party loan servicer may not use "**unfair or unconscionable means**" when servicing a loan. 209 CMR § 18.21(1). The Code also prohibits "misrepresenting any material information [including] the amount, nature or terms of any fee or payment due…and conditions of the servicing contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders provide borrowers with a Notice of the Right of Rescission which provides the "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). The evidence proves Homeward pervasively violated the duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan modifications. For this additional reason the annual Homeward Certifications of Compliance with federal and state [Massachusetts] consumer lending laws under the SPA were false certifications/representations of compliance. The evidence further proves that Homeward pervasively violated these Massachusetts laws protecting consumers. Those violations, at various times, make Homeward's certification of compliance with state [Massachusetts] laws and regulations in the initial SPA, and each year thereafter, a false certification and false statement to the United States (1) made or used to fraudulently induce the United States to approve the SPA and (2) constituted false statements that violated the conditions of payment..

96.     Homeward's pervasive violations by making false certifications/representations of compliance of federal and state laws, regulations and rules to Fannie Mae fraudulently (1) induced Fannie Mae to approve the SPA with Homeward, and (2) approve the payment of huge incentives under the SPA all while Homeward stood in violation of, at least, the following state law provisions:

## A.     Texas Constitutional and Administrative Law

### 1.     Constitutional Law

97.     Homeward has modified (1) Texas home equity loans and (2) purchase money mortgage loans by making "an advancement of new funds, or by increasing the obligations beyond those created by the original note and deed of trust" without complying with Tex. Const. Art. XVI, § 50(a)(6). Homeward has at times, when making "**new extensions of credit**," added tens of thousands of dollars to the principal balance, far in excess of (i) of the sums due and (ii) the obligations arising out of the **original note** or deed of trust which, for example, abridged the limits of constitutionally reasonable closing costs. 7. Tex. Admin. Code § 153.14(2)(B).

98.     According to well established Texas law, if mortgage servicers in a "**new extension of credit**" increase, beyond an amount of reasonable and necessary closing costs, the principal balance of existing loans, whether purchase money loans or home equity loans, the transaction constitutes a home equity loan under section 50(a)(6) as a matter of law, whether intended or not, and triggers a number of constitutional requirements and disclosures that protect the borrower's homestead. Homeward often failed to abide by its duets to provide the protections

of Section 50(a)(6) for Texas modifications when making borrowers "**new extensions of credit"** as defined by the Texas Supreme Court in the recent *Sims* **case**.[55]

99.    Loan modifications, involving **"new extensions of credit,"** that increase the principal balance by collateralizing accrued interest, past or future property taxes, or past or future insurance seek to secure additional home equity and are thus home equity loans under Texas law. Further, Tex. Const. Art. XVI, § 50(e) states that when a lender advances "additional sums" (any sum over and above "reasonable and necessary closing costs") to an existing purchase money loan, the lender has actually made a—perhaps unintended—home equity loan. In addition, Texas law unequivocally requires, if there a **"new extension of credit**" as outlined by the Texas Supreme Court in the *Sims* case*, that when a lender advances additional sums to an existing home equity loan it must satisfy **all the requirements** of Section 50(a)(6)(A) – (Q)— *i.e.*, all the requirements applicable to a home equity loan. If the loan modification, involving a **"new extension of credit**," does not comply with the long, demanding list of requirements at 50(a)(6)(A) – (Q), **no lien attaches** to the homestead. The lender has an unsecured, non-recourse loan unless and until it cures the loan within sixty (60) days of being notified by the borrower of the lender's failure to comply. *See* Tex. Const. Art. XVI, § 50(a)(6)(Q)(x). There is no other *safe harbor* for Texas home loan modifications which involve a [Sims] "**new extensions of credit."** Homeward has violated most of the provisions of the Texas constitution Section 50(a)(6)-(Q) on each of the qualifying loan modifications.

100. The evidence proves that Homeward *increased,* unlawfully, the Texas borrowers'

---

[55] *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014).

principal balances by making the *Sims* "**new extensions of credit**" including the new financial burden of charging interest on interest (not allowed under the **original note** or deed of trust) capitalizing new debt principal consisting of such items as (1) past due interest, which began accruing interest for the **first time**; (2) past due or future property taxes; (3)past or future prepayments of escrow, and (4) some completely undefined fees or costs. According to Texas constitutional law, the lender who has made new *Sims* "**extensions of credit**" is restricted by Section 50(a)(6) and is allowed to add debt in the amount of reasonable closing costs only; each home equity loan refinance has a reasonable allowance of 3% for closing costs against the sums advanced. Adding new debt, by way of new extensions of credit, to the principal is strictly prohibited. A 2001 Interpretation Letter drafted by banking regulators, and laying the groundwork for 7 Tex. Admin. Code **§** 153.14(2)(B) states:

> A modification to increase the principal amount advanced would be prohibited because it would have the effect of turning the home equity loan into a line of credit, which is expressly prohibited.

Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001), **http://www.uspap.org/** (last visited 9/2/14). Subject to the *Sims* decision, regulations state that "[t]he advance of additional funds to a borrower is not permitted by modification of an equity loan." 7 Tex. Admin. Code § 153.14(2)(B). Equally important is the Texas requirement that payments be an invariable monthly amount for the life of the loan. Principal was often increased so much, however, that even with a lower interest rate, borrower payments increased and constituted an additional state law violation. To counteract this problem, Homeward instituted modification terms involving interest-only payments and balloons, which created dramatic

payment increases as the loan matured. Tex. Const. Art. XVI, § 50(a)(6)(L)(i). These laws clearly apply to the "new extensions of credit" clarified by *Sims*.

101.    Furthermore, Homeward failed to conform to Texas state law requirements pertaining to the modification of purchase money mortgage loans involving "**new extensions of credit.**" Specifically, in its Purchase Money Mortgage ("PMM") modifications, Homeward, although required by Texas law, **<u>did not</u>**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company. **Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

2.    *Sims* **"Extensions of Credit" triggering Section 50(a)(6) applications**

102.    In a recent decision,[56] the Texas Supreme Court held that as long as there is no additional "**extension of credit**" in the modification of a home equity loan, the modification, or "restructuring," is valid and need not comply with the requirements of Tex. Const. Art. XVI, § 50(a)(6). The Court identified three situations, however, which constitute an new "**extension of credit**" which render the loan modifications subject to the home equity provisions in Section 50(a)(6) of the Texas Constitution. The *Sims* case defined an "extension of credit" as follows for purposes of home equity loan modifications:

1.   A **re-financing** or "satisfaction or replacement" of the original note;"

2.   An **advancement of new funds** which were not due and owing under the terms of the original note or deed of trust; and

3.   The borrower has **new/increased obligations**, as a result of the modification, which were not created by the terms of the original note or deed of trust.

---

[56] *Sims, et al. v. Carrington Mortgage Services, LLC*, No. 13-068 Tex. Sup. Ct., (Tex. May 16, 2014). There is no reason to believe that the Supreme Court would rule differently in regards to purchase money mortgage modifications.

103.    The *Sims* opinion made evident that capitalizing any funds on the principal balance in a home equity loan modification, for obligations that grew out of the original mortgage contract/Deed of Trust, may be done without regard to Texas Section 50(a)(6) home equity provisions. However, if within the modification contract, any new funds are advanced for an obligation that did not arise from rights granted to the lender/servicer under the original note/Deed of Trust **those advances of new funds implicated** Section 50(a)(6). Similarly, the same is true if the lender imposes **increased or new obligations** which do not arise out of (i) the original note or (ii) deed of trust. Both of the foregoing events are considered "extensions of credit" and are subject to the home equity provisions of Section 50(a)(6), which includes providing the borrower the Notice of the Right of Rescission which was never provided to AHSMI's borrowers with loan modifications in Texas; although required under TILA/Reg Z, Texas law or Massachusetts laws, respectively, when appropriate.

104.    Upon information and belief, Homeward has increased Texas borrower obligations by:

- Adding modification fees and costs including but not limited to ancillary costs (e.g. charges for Broker Price Opinions, property inspections, appraisals, etc.) not arising out of the original note or deed of trust.

- Imposing interest on interest not allowed under the original note or deed of trust;

- Requiring the establishment of an escrow account that was not required by the terms of the original note/deed of trust; and

- Extending the repayment period with only partial amortization creating large balloon payments due at the maturity of the modified note.

105.    The situation, outlined below, occurs in many modifications and would not be restricted to Texas, but would also be governed by the TILA/Reg Z Right of Rescission under Federal law, as well as the Right of Rescission duties which arise pursuant to state laws (Massachusetts and Texas) depending on the jurisdiction where the modifications were finalized.

### 3. The Relevant Situation

106.    When a borrower enters into a Note/Deed of Trust for a residential mortgage loan there are two methods by which to pay their property taxes and insurance premiums. Insurance premiums are always paid in advance, monthly, quarterly or annually. The escrow provisions for insurance or taxes are fact specific to the each particular note and/or deed of trust. There are no generalizations that apply broadly to all mortgage contracts/security agreements. With this in mind, the following transactions would constitute a new obligation imposed by Homeward on the borrower which would require Homeward's compliance with Texas Constitution Section 50(a)(6) home equity provisions.

1. Borrower enters into an original purchase money note/deed of trust and the contract often **does not** expressly require that the borrower must maintain an impound/escrow account with the lender, and the borrower may elect to pay their insurance premiums and/or property taxes directly to the county/insurance company; and

2. Borrower then later enters into a modification contract wherein a condition of approval of the modification **requires the borrower to establish an escrow** account with the servicer/lender for the escrow of funds to pay annual taxes and insurance premiums.

Because the imposition by the Homeward of an escrow account was not required by the terms of the note/deed of trust, the imposition of the escrow arrangement in the modification of the loan

constituted a **new obligation** and, thus, a "**new extension of credit**" triggering lender compliance with Texas' Section 50(a)(6) home equity provisions.

107.    Additionally, on some modifications, both HAMP and non-HAMP, the servicer is advancing/loaning new funds for Modification fees, expenses and costs that do not arise out of the original note or deed of trust. While *Sims* allows the capitalization of past due items arising from the original note and/or deed of trust, the prospective, post-modification imposition for the charging of interest on interest on any (i) capitalized past due interest, (ii) capitalized property taxes and insurance premiums; (iii) prospective, not yet due escrow items and (iv) reserve amount required by the servicer were new obligations that **would not have been allowed** without the borrower's approval in writing of the loan modification agreement. The HAMP agreements expressly provide:

> [Borrowers] understand that interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

108.    It is only by the express wording of the <u>modification contract</u> that interest is charged by the lender on these newly capitalized amounts; the original note and/or deed of trust did not allow this interest on [capitalized] interest charge. Therefore, the charging of interest against the new capital advanced is a **new obligation** imposed on the borrower by the modification, thus triggering Texas Section 50(a)(6) home equity requirements

109.    Additionally, Homeward in its modifications of Home Equity Loans and Purchase Money Mortgages Homeward, although required by Texas law, made new extensions of credit and **<u>did not</u>**:

- Schedule loan modifications for repayment in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment. **Tex. Const. Art. XVI, § 50(a)(6)(L)(i).**

- Close loan modifications at the office of the lender, an attorney at law, or a title company**. Tex. Const. Art. XVI, § 50(a)(6)(N).**

- Provide a disclosure in the security instrument that the extension of credit is the type of credit defined by Section **50(a)(6). Tex. Const. Art. XVI, § 50(a)(6)(Q)(vi).**

- Provide the owner of the homestead that he or she may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii).**

- Include a written acknowledgement as to the fair market value of the homestead property on the date the extension of credit is made, signed by the owner of the homestead and the lender. **Tex. Const. Art. XVI, § 50(a)(6)(Q)(ix).**

- Ensure that the maximum principal amount extended, when added to all other debts secured by the home, did not exceed 80 percent of the fair market value

of the home on the date the line of credit is established. **Tex. Const. Art. XVI, § 50(a)(6)(R)(5).**

### 4.   Pervasive Violations by Purchase Money Mortgage Modifications in Texas

110.   The evidence proves that from and after Defendant's finalization of the SPA under the HAMP program, Defendant's loan modifications of purchase money mortgages in the State of Texas virtually always involved adding the *Sims* "new extensions of credit," not arising from the original note or deed of trust. As such, the transaction constituted, as a matter of law, a home equity loan. According to Texas law post-*Sims*, permitted modifications of a purchase money mortgage except for those involving "new extensions of credit;" otherwise, the modified loans converted to a home equity loan involving the protections of section 50(a)(6) of the Texas Constitution.

111.   Since virtually all purchase money mortgage modifications by the Defendant involved the *Sims* "new extension of credit," , the modifications were home equity loans under Texas law, and Homeward was required to comply with all of the provisions of Section 50(a)(6)A-Q which Homeward knowingly failed to do. The evidence proves that Defendant violated virtually all of the Texas Constitutional provisions as set out here and below on its attempted purchase money mortgage modifications. Thus, Homeward's certifications/representations of compliance in its initial SPA, and sequential annual certifications, all of which were and are express conditions of payment under HAMP, were false for these additional reasons.

### 5.     Loan-to-value Ratio

112.     In addition, Homeward violates the Texas Constitution by collateralizing the new extensions of credit in contravention of Texas Constitution Article XVI, Section 50(a)(6). To comply with Section 50(a)(6), a new loan/modification which involves a new extension of credit must be completed without violating the strict 80% loan-to-value restriction. Tex. Const. Art. XVI, § 50(a)(6)(B). The evidence Relators directly and independently obtained and/or witnessed shows that virtually all of Homeward's Texas loan modifications violated Texas' 80% loan-to-value restriction as a result of the severe drop in Texas property values during the 2008 national financial crisis and the amounts advanced by Homeward.

### 6.     Closing Location

113.     In addition, the Texas constitution requires home equity loans involving new extensions of credit to close in person **only at the office of a lender, attorney or title company**. Tex. Const. Article XVI § 50a(6)(N). All of Homeward's mortgage modifications unlawfully closed by the borrower executing the documents and sending them to Homeward by mail, Federal Express, or other carrier for finalization. The Texas Supreme Court has definitively ruled that the borrower, himself/herself, must attend all closing activities in the constitutionally permitted venues of an office of the lender, an attorney or title company, only. *The Financial Committee Of Texas, et al. v. Valerie Norwood, et al.*, No. 10-0121, (Tex. Sup. Ct. Jan. 24, 2014). Homeward did not comply with this recently confirmed Texas Constitutional requirement, or many of the other Section 50 requirements.

### 7.      Texas Notice of Right of Rescission

114.     One of the requirements for home equity loans, involving extensions of credit, under the Texas Constitution, like Section 1026.23(a) of Regulation Z, is that the servicer/lender must provide the borrower(s) with the mandated **Notice of the three (3) day Right of Rescission**. Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii). As evident in **Exhibit 4**, Relators' evidence indicates that the mandated Notices were not provided under either the federal or state laws. The owner of a homestead in Texas may, within three days after an extension of credit secured by his or her homestead is made, rescind the transaction without penalty or charge. Tex. Const. Art. XVI, § 50(a)(6)(Q)(viii). The Texas law is, therefore, similar to TILA's Regulation Z, which states that, in any transaction subject to rescission, the creditor must give the consumer the required written Notice of Right to Rescind. 12 C.F.R. § 1026.23(a)-(b). Based on Relators' direct and independent knowledge, Homeward did not comply with the federal or state legal requirement, so virtually all of Homeward's Texas modification contracts do not include either the required federal or Texas three day Notice of the Right of Rescission. The concealment of the absence of these Notices of the Right of Rescission where additional violations of state law, thus for these additional reasons rendering Homeward's SPA false.

### 8.      Full Amortization

115.     The Texas Constitution, interpreted by *Sims,* states that home equity loans involving the Sims "new extensions of credit" must be fully amortizing at inception and must remain that way. Home equity loans must provide for equal payments over the course of the loan, must pay down principal with each installment, and must be fully amortizing (i.e. a steadily

downward sloping principal curve that is zero at maturity). Tex. Const. Art. XVI, § 50(a)(6)(L) and 7 Tex. Admin. Code § 153.11. As the evidence demonstrates, Homeward loan modifications violated these provisions.

116.    In short, § 50(a)(6)(L) requires that affected loans:

1.   Have a definite **non-balloon** pay-off date;

2.   Are **fully** amortizing; and

3.   Pay down principal with every installment (7 Tex. Admin. Code Sec. 153.11).

The Texas Department of Banking and other state regulatory agencies stated that:

> Section 50(a)(6) does not specifically allow or even mention modifications of home equity loans. Elsewhere, the constitution provides that a refinance secured by the homestead, any portion of which is a home equity loan, may not be secured by a valid lien against the homestead **unless the refinance of the debt is a home equity loan.** (citing Tex. Const. art. XVI, §50(f)).

Tex. Jt. Fin. Reg. Agencies, "Home Equity Modification Interpretation Letter," (Dec. 20, 2001).

**9.   Examples of Homeward Texas Modification Contracts**

117.    Attached hereto as **Exhibits 4 – 5** are Texas contract examples. The following examples are included:

**Exhibit 4       Servicer: - Homeward**
**Loan No. --------375, Borrower name Redacted**
City, State: Cedar Hill, TX
New Advance of funds: $20,496.32
New Principal Balance AFTER modification: $213,487.51
Start Date of Modification: August 2011
Violates 80%LTV:     A) Property Value on Modification Date - $134,294
                     B) 80% LTV on Modification date - $107,435
                     C) $ amount over 80% LTV - $106,052.51
Credit Extension Type: New Obligations not included in Original Contract

**New Interest on [capitalized] Interest Charges**: Interest charged on capitalized, past due interest, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws

In this modification the servicer advanced new sums to the borrower by adding to the principal balance, amounts not due or allowed under the original Note/Deed of Trust. These amounts included; 1) fees/costs associated with the modification, 2) obligating the borrower for interest over the next some 25 to 40 years on the delinquent interest added to the principal balance, 3) new interest on the past due property taxes/escrow, 4) and the now accruing interest on the advanced amount not yet due of funds to be placed in the escrow account for future escrow expenses and paid over the next some 25 to 40 years. The Servicer increased the borrowers obligation by causing interest to now be required to be paid on the delinquent interest, the past due property taxes/escrow, the advanced but not yet due funds to be placed in the escrow account for future expenses, and any fees /costs associated with the modification and the interest now accruing on those fees/costs advanced. These new advanced amounts/obligations carried the duty to meet the requirement of Texas Constitution Section 50.

**New obligations**, triggering the duties under Texas Constitution Section 50(a)(6), are created for the borrower if the **original** Note/Deed of Trust did **not require** the establishment of an escrow account, but the establishment of an escrow account was a condition of approval for the modification, as was required for in every modification I have reviewed. It would also be a **new obligation** to the borrower when any extension of the original amortization schedule, as called for in the original Note/Deed of Trust, by virtue of the modification contract was extended. This is a **new, additional obligation** due to causing the borrower an increased amount of interest to be paid, greater than that called for in the original Note/Deed of Trust over the term of the loan.

Further, the extension of the amortization schedule wherein the modified loan is not a fully amortizing loan within the term of the loan, as set forth in the **original** Note/Deed of Trust, whereby it causes the monthly payment to not fully pay down the principal within the loan term, and thereby creates a monthly short fall on paying down the principal each month that results in the creation of a Balloon Payment at the end of the loan term, that was not part of the original Note/Deed of Trust, constitutes a new credit transaction under Texas Section 50(a)(6), and requires that the servicer/lender comply with the requirements of Texas Constitution Section 50(a)(6).

**Texas State Violations within Section 50(a)(6), Article XVI, Texas Constitution and Tex. Admin Code 153 on this contract:**

1. Section 50(a)(6)(Q)(viii) – No notice of right of Rescission form provided with contract.
2. Section 50(a)(6)(Q)(ix) – No written acknowledgement as to fair market value of homestead on date extension of credit is provided.
3. Section 50(a)(R)(5) – Principal amount exceeds 80% LTV.
4. Section 50(a)(6)(N) -- Was not closed at the office of a lender, attorney or title company.

**Exhibit 5**       **Servicer: - Homeward**
                    **Loan No. 4001432253 - Borrower name redacted**
                    City, State: Carrollton, TX 75010
                    New Advance of funds: $47,473.59
                    New Principal Balance AFTER modification: $201,788.38
                    New Principal Balance AFTER modification: $186,710.21
                    Deferred Principal: NONE –
                    $Amt. due in a Balloon Payment from Deferred Principal: None
                    Not Fully Amortized creating a **Balloon Payment** of: **$115,869.36**
                    Start Date of Modification: November 2011; Term: 298 months
                    Monthly shortage on payment over fully amortized: $256.78
                    <u>Violates 80%LTV</u>: A) Property Value on Modification Date -
                              $198,000
                                       B) 80% LTV on Modification date - $158,400
                                       **C) $ amount over 80% LTV - $43,388.38**
                    **New Interest on [capitalized] Interest Charges**: Interest charged on
                    capitalized, past due interest, any reserve amounts for property taxes and
                    insurance premiums not allowed under the original note or deed of trust, nor
                    by State and Federal banking rules, regulations, and/or laws

     In this modification the servicer advanced new sums to the borrower by adding to the principal balance, amounts not due or allowed under the original Note/Deed of Trust. These amounts included; 1) fees/costs associated with the modification, 2) obligating the borrower for interest over the next some 25 to 40 years on the delinquent interest added to the principal balance, 3) new interest on the past due property taxes/escrow, 4) and the now accruing interest on the advanced amount not yet due of funds to be placed in the escrow account for future escrow expenses and paid over the next some 25 to 40 years. The Servicer increased the borrowers obligation by causing interest to now be required to be paid on the delinquent interest, the past due property taxes/escrow, the advanced but not yet due funds to be placed in the escrow account for future expenses, and any fees /costs associated with the modification and the interest now accruing on

**Relators' Second Amended Complaint**                                    78

those fees/costs advanced. These new advanced amounts/obligations carried the duty to meet the requirement of Texas Constitution Section 50.

**New obligations**, triggering the duties under Texas Constitution Section 50(a)(6), are created for the borrower if the **original** Note/Deed of Trust did **not require** the establishment of an escrow account, but the establishment of an escrow account was a condition of approval for the modification, as was required for in every modification I have reviewed. It would also be a **new obligation** to the borrower when any extension of the original amortization schedule, as called for in the original Note/Deed of Trust, by virtue of the modification contract was extended. This is a **new, additional obligation** due to causing the borrower an increased amount of interest to be paid, greater than that called for in the original Note/Deed of Trust over the term of the loan.

Further, the extension of the amortization schedule wherein the modified loan is not a fully amortizing loan within the term of the loan, as set forth in the **original** Note/Deed of Trust, whereby it causes the monthly payment to not fully pay down the principal within the loan term, and thereby creates a monthly short fall on paying down the principal each month that results in the creation of a Balloon Payment at the end of the loan term, that was not part of the original Note/Deed of Trust, constitutes a new credit transaction under Texas Section 50(a)(6), and requires that the servicer/lender comply with the requirements of Texas Constitution Section 50(a)(6).

**Texas State Violations within Section 50(a)(6), Article XVI, Texas Constitution and Tex. Admin Code 153 on this contract:**

1. Section 50(a)(6)(Q)(viii) – No notice of right of Rescission form provided with contract.
2. Section 50(a)(6)(Q)(ix) – No written acknowledgement as to fair market value of homestead on date extension of credit is provided.
3. Section 50(a)(R)(5) – Principal amount exceeds 80% LTV.
4. Section 50(a)(6)(N) -- Was not closed at the office of a lender, attorney or title company.

### 10.    Homesteaders, In Effect, Become "Renters"

118.    When servicers add tens to hundreds of thousands of dollars of principal balance

to the original note, while making "new extensions of credit" they make it virtually impossible

for the borrower to ever have any hope of paying the loan off. As a result of the monetary increase in the principal balance, the new loan principal begins accruing its own interest. To make the payments affordable, many loans have stepped interest rates, deferred principal, partial amortization, and balloon payments, which result in a mortgage note that is not paid down in accordance with the **mandatory**, fully-amortizing requirement of § 50(a)(6)(L).

## B.   New York State Law

119.   New York Regulation 3 NYCRR § 419.11 states that servicers must make "reasonable and good faith" efforts when offering loan modifications to borrowers. Loan modifications should have payments that are "**affordable and sustainable"** for borrowers, and prevent foreclosure. Second, servicers are required to provide borrowers with written disclosures that clearly state the "**material terms, costs and risks**." 3 NYCRR 419.11(b) and (d). The evidence proves that Homeward pervasively violated both New York provisions, thus making its certification of compliance [a condition of payment] with state [New York] laws in the initial SPA a fraudulent inducement of the United States to approve the SPA and purchase the Financial Instrument, and each year thereafter, a material false statement to the United States as a condition of payment.

120.   According to 3 NYCRR § 419.11, Servicers must take steps to ensure that borrowers are treated fairly in accordance with HAMP guidelines and rules established by the United States Department of Treasury. The Servicer is required to inform the borrower of the details of the loan, including the status of the default and all "loss mitigation" procedures and services that can be considered. 3 NYCRR § 419.11(a)(1). If requested, they are also required to

"negotiate with the borrower in good faith, subject to the Servicer's duties and obligations under the mortgage servicing contract, if any, to attempt a resolution or workout of the delinquency or to prevent the borrower's default, including a loan modification." 3 NYCRR § 419.11(a)(2).

121.    In addition, § 419.11(b) of the regulation requires that:

> Loan modifications should be structured to result in payments that are ***affordable*** **and** ***sustainable*** for the borrower. Servicers that are participating in HAMP shall offer loan modifications in compliance with the HAMP guidelines or directives, including using reasonable efforts to remove prohibitions or impediments to their authority and to obtain third party consents and waivers that are required, by contract or law, in order to effectuate a loan modification under HAMP. (*emphasis added*).

122.    Based on the evidence, the Servicer did not adhere to these guidelines and, instead, provided modifications that were <u>not</u> affordable or sustainable resulting in many borrower failures to perform the terms and conditions of the modified note.

123.    Moreover, Homeward did not provide borrowers with required written disclosures that clearly state the "material terms, costs and risks." 3 NYCRR 419.11(d) specifically requires that:

> Within 30 days of receiving all required documentation from the borrower and third parties, unless a shorter time is required under regulations or guidelines implementing HAMP, a Servicer shall complete its evaluation of the borrower's eligibility for a loan modification or other loss mitigation option requested by the borrower and advise the borrower, and if applicable, the borrower's authorized representative, in writing of its determination. Where the Servicer approves the borrower for a loan modification, <u>including</u> a trial modification, or other loss mitigation option, the written notice <u>must provide</u> the borrower with ***clear and understandable written information explaining the material terms, costs and risks*** of the option offered. (*emphasis added*).

Homeward's failure to provide these required disclosures were pervasive throughout New York.

124.    Finally, there is a presumption of good faith "if the Servicer offers loan modifications and other loss mitigation options in accordance with the HAMP guidelines…" 3 NYCRR § 419.11(i). Homeward did not act in good faith, however, when it provided terms that were not conducive to the borrower avoiding foreclosure and saving the home on a long term basis. Similarly, the Servicer's pervasive **failures**, upon information and belief, to provide the mandated, written disclosures clearly disclosing the "**material terms, costs and risks**," constituted the second major prong for New York modification violations. *See* 3 NYCRR § 419.11(d). These New York state law violations, again, **rendered false** the Servicer's certification of compliance with federal and state laws in the initial SPA which fraudulently induced the U.S. to approve the SPA and purchase the Financial Instrument, and was a false record which Homeward used to obtain huge incentive payments each year thereafter, when Homeward falsely re-certified legal compliance with federal and state laws to Fannie Mae.

125.    In *U.S. Bank Nat. Ass'n v. Padilla*, the bank was involved in "bad faith" loss mitigation negotiations with the borrower, "plunging her deeper and deeper into arrears, raising the very real probability that she will never be able extricate herself from this debt and work out an affordable loan modification." 31 Misc. 3d 1208(A) at *3 (N.Y. Sup. Ct. 2011). After more than a year of negotiations and settlement conferences, U.S. Bank and its representatives gave contradictory information and made "piecemeal requests" for documents that caused a delay in a decision on a HAMP or in-house modification. *Id*. This delay resulted in an increase in fees, interest, and penalties to the bank's benefit and "the homeowner's detriment." *Id.* The Court found that the bank also violated many of the subsections of NYCRR § 419.11 by not meeting

the Servicer obligations regarding loss mitigation negotiations. The court stated that "in the wake of new legislation, decisions are beginning to emerge in which the courts are finding that the banks have engaged in discriminatory, unconscionable, and onerous lending practices and are now negotiating settlements of these oppressive loans in bad faith." *Id. See* also *Aurora Loan Services, LLC v. Dunning*, 2012 N.Y. Misc. LEXIS 2636 (N.Y. Sup. Ct. May 25, 2012). The *Padilla* Court recognized that these unlawful practices are common among mortgage loan servicers/banks. The *Dunning* Court similarly found a lack of good faith by the lender/servicer.

### 1.      Homeward Examples of NY Modification Contracts

126.    Attached hereto as **Exhibit 6** is a New York contract example. The following example is included:

| | |
|---|---|
| **Exhibit 6** | **Servicer: Homeward** |
| | **Loan No. 0021921739, Borrower name redacted** |
| | City/State/Zip: Amityville, New York 11701 |
| | New Advance of funds: Not disclosed in contract |
| | New Principal Balance AFTER modification: $276,192.50 |
| | Deferred Principal: $54,185.00 |
| | Deferred Principal eligible for forgiveness: $ |
| | Interest Bearing Principal Amount: $221,377.50 |
| | Balloon Payment on Deferred Payment: $54,815.00 |
| | Start Date of Modification: December 2011; Term: 295 months |
| | Monthly payment in modification contract for Principal & Interest: $670.39 |
| | Monthly Payment if fully amortized over 295 months: $950.58 |
| | Amortization schedule in contract extended 185 extra months; 15.42 yrs. |
| | Monthly shortage on payment over fully amortized: $280.19 |
| | Contract <u>Not</u> Fully Amortized creating a Balloon Payment: YES |
| | Balloon Payment due to not full amortization: $123,606.77 |
| | Total Balloon Payment due: $178,421.77 |

**New Interest on [capitalized] Interest Charges**: Interest charged on capitalized, past due interest, any reserve amounts for property taxes and

insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws

**New York State violations within 3 NYCRR § 419.11 on this contract**:

1. Section 419.11(b) – Requires that modifications be affordable and sustainable.
- The minimum total Balloon Payment due at the end of the loan term is $178,421.77. This amount, due after 24.5 years of borrower's payments, is 64.6% of the initial Interest Bearing Principal the borrower started with.
- The monthly payment is short of paying the full principal if fully amortized by $280.19 per month.

2. Section 419.11(d) – Requires that borrowers receiving a modification must receive clear and understandable written information explaining the material terms, costs and risks of the option offered. The contract does not ever use the term "Balloon Payment" in any language throughout the contract.
- The contract does not provide for the previous principal balance before any advanced funds are added.
- The contract does not disclose to the borrower the amount of new funds being advanced and added to create the new principal balance after the modification.
- The contract does not explain that the borrower shall pay a monthly Principal & Interest payment wherein the principal is short by $280.19 per month for 295 payments. The contract does not disclose that this monthly shortage shall result in a Balloon Payment of $178,421.77 due at the end of the loan term by the borrower.
- Additionally, the contract fails to explain that the amortization schedule is extended to 185 months beyond the loan term creating the monthly shortage amount on principal and Balloon Payment – a clear and understandable explanation of this is not reflected in the contract for the borrower.

3. Section 419.11(i) – There is the presumption of good faith "if the servicers offer borrowers a modification."
- The violations above demonstrate that there was a lack of "good faith" in the modification offered to the borrower.
- This contract fails to provide the borrower the Federally mandated, and any New York State required, TILA, Regulation Z, Right of Rescission form on the newly advanced funds added to the original principal balance creating a new increased principal balance.

## C.    Massachusetts Law

127.    Massachusetts also has stringent requirements for servicers. In its discussion of

mortgage loan servicing practice, the Code of Massachusetts' Regulations mandates that a third-

party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209 CMR § 18.21(1). The Code also prohibits "misrepresenting any material information [including] the amount, nature or terms of any fee or payment due…and conditions of the servicing contract." 209 CMR § 18.21(1)(i). Massachusetts' law and regulations also require that lenders provide borrowers with Notice of the Right of Rescission which provides the "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of the person. Mass. Gen. Laws Ch. 140D § 10(b). Homeward pervasively violated the duty under Massachusetts law to provide borrowers the Notice of the Right of Rescission at the time of loan modifications. For this additional reason the original and annual Homeward Certifications of Compliance with federal and state consumer lending laws under the SPA were material false statements, false certifications and false records used to obtain huge incentive payments from the United States.

128.    In its discussion of mortgage loan servicing practices, the Code of Massachusetts Regulations mandates that a third-party loan servicer may not use **"unfair or unconscionable means"** when servicing a loan. 209 CMR § 18.21(1).

129.    The following conduct is specifically prohibited:

(a) Knowingly misapplying or recklessly applying loan payments to the outstanding balance of a loan.
…
(i) **<u>Misrepresenting any material information</u>** in connection with the servicing of the loan, including, but not limited to, **misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing contract or the borrower's obligations under the loan**.

**Relators' Second Amended Complaint**                                                                    85

Upon information and belief, Homeward violated this law as outlined by the Massachusetts' high court below.

130.    Under Massachusetts' UDAP law,[57] loans that are "doomed to foreclosure" are unfair. In *Commonwealth of Massachusetts v. Fremont Investment & Loan*, the highest court in Massachusetts affirmed a lower court's ruling that loans with a specific set of features were presumptively unfair, because the only way borrowers could avoid foreclosure was if housing values rose. 897 N.E.2d 548 (Mass. 2008) ("General Laws c. 93A, §  2(a), makes unlawful any "unfair or deceptive acts or practices in the **conduct of any trade or commerce**."):

> More to the point, at the core of the judge's decision is a determination that when Fremont chose to combine in a subprime loan the four characteristics the judge identified, Fremont knew or should have known that they would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow unless residential real estate values continued to rise indefinitely -an assumption that, in the judge's view, logic and experience had already shown as of January, 2004, to be unreasonable.
>
> ***
>
> Fremont correctly points out that as a bank in the business of mortgage lending, it is subject to State and Federal regulation by a variety of agencies. Well before 2004, State and Federal regulatory guidance **explicitly warned** lending institutions making subprime loans that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices" under G.L. c. 93A. Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997). More particularly, the principle had been clearly stated before 2004 that loans made to borrowers on terms that showed they **would be unable to pay and therefore were**

---

[57] Mass. G.L. c. 93A, § 2.

**likely to lead to default were unsafe and unsound, and probably unfair**. Thus, an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally **considered unsafe and unsound**" (emphasis supplied).   Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001). On February 21, 2003, one year before the first of Fremont's loans at issue, the OCC warned that certain loans could be unfair to consumers:

> When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm. "[S]uch disregard of basic principles of loan underwriting lies at the **heart of predatory lending** ."OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003).

*Id.* at 556-557; Homeward

    1.    **Mass. Right of Rescission**

    131.    The Massachusetts Consumer Credit Cost Disclosure Act (MCCCDA) determines the rights and liabilities of "consumer credit transactions." **Mass. Gen. Laws Ch. 140D § 10**. The Massachusetts legislature closely modeled the MCCCDA after TILA, making them materially the same.

    132.    Massachusetts' **right of rescission** gives an "obligor" a right to rescind a consumer credit transaction that involves an added security interest in the principal dwelling of

the person. Once an obligor rescinds the transaction, he is not liable for finance or other charge, and any security interest given by the obligor becomes void upon such rescission. **Mass. Gen. Laws Ch. 140D § 10(b). Homeward did not provide Massachusetts borrowers the require Notice thus rendering false for this additional reason the original certification and annual re-certifications of compliance with state law under the HAMP requirements.**

> **2.** **Homeward Examples of Massachusetts Modification Contracts**

133.    Attached hereto as **Exhibits 7-8** are Massachusetts contract examples. The following examples are included:

**Exhibit 7        Servicer: Homeward**

> **Loan No. 4000351736, Borrower name redacted**
> **City, State: Hanson, MA 02341**
> New Advance of funds: $46,330.12 – 19% increase of loan
> New Principal Balance AFTER modification: $290,142.19
> Deferred Principal: $73,260.00
> Interest Bearing Principal Amount: $216,892.19
> Start Date of Modification: November 2010; Term: 297 months
> Monthly payment in modification contract for Principal & Interest: $624.71
> Monthly shortage on payment over fully amortized: $301.76
> Total Balloon Payment due at term of loan: $221,918.43

>> **New Interest on [capitalized] Interest Charges**: Interest charged on capitalized, past due interest, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws

> **Massachusetts State Violations within 209 CMR § 18.21 and Mass. Gen. Laws Ch. 140D § 10(b) on this contract:**

> 1. Mass. Gen. Laws Ch. 140D § 10(b) -
>    - Homeward fails to provide the borrower the federally mandated, and the Massachusetts required Right of Rescission form on the newly advanced funds added to the original principal balance.
> 2. 209 CMR § 18.21(1)(i) -

- The contract includes a monthly shortage of $301.762 per month and the borrower is not informed that this shortage accrues compound interest for the next 297 months.
- As a result of the amortization, the contract creates a Balloon Payment. At loan maturity, $221,918.43 will be due after nearly 25 years of payments.

3. 209 CMR § 18.21(1) -
- The failure to inform the borrower of the extended amortization schedule, and that it will cause an increased amount of interest to be paid over the term of the loan, coupled with the omission of the exact amount of funds added to the principal balance, misrepresents "material information" and represents "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to Massachusetts law.

**Exhibit 8**       **Servicer: Homeward**
**Loan No. 4001623688, Borrower name redacted**
**City, State: Harwich, MA 02645**
New Advance of funds: Contract does not disclose
New Principal Balance AFTER modification: $403,929.70
Interest Bearing Principal Amount: $403,929.70
Start Date of Modification: January 2012; 281 Months
Monthly payment in modification contract for Principal & Interest: $1,524.17
Monthly Payment if fully amortized over 281 Months: $1,801.43
Monthly shortage on payment over fully amortized: $259.26
Total Balloon Payment due at after over 23 years of payments: $115,022.27
(28.48% of Principal Balance at start of modification)

> **New Interest on [capitalized] Interest Charges**: Interest charged on capitalized, past due interest, any reserve amounts for property taxes and insurance premiums not allowed under the original note or deed of trust, nor by State and Federal banking rules, regulations, and/or laws

**Massachusetts State Violations within 209 CMR § 18.21 and Mass. Gen. Laws Ch. 140D § 10(b) on this contract:**

1. Mass. Gen. Laws Ch. 140D § 10(b) -
- Homeward fails to provide the borrower the federally mandated and the Massachusetts required Right of Rescission form on the newly advanced funds added to the original principal balance.

2. 209 CMR § 18.21(1)(i) -
- Homeward fails to provide the borrower the exact, itemized amount of funds being added to create the NEW principal balance.

- The contract includes a monthly shortage of $259.26 per month not disclosed to the borrower, nor is the borrower informed that this shortage accrues compound interest for the next 281 months.
- As a result of the amortization, the contract creates a Balloon Payment. At loan maturity, $115,022.27 will be due after nearly 23 years of payments.

3. 209 CMR § 18.21(1) -

- The failure to inform the borrower of the extended amortization schedule, and that it will cause an increased amount of interest to be paid over the term of the loan, coupled with the omission of the exact amount of funds added to the principal balance, misrepresents "material information" and represents "unfair or deceptive acts or practices in the conduct of any trade or commerce" pursuant to Massachusetts law.

## XII. FAILURE BY HOMEWARD TO SELF-REPORT

134.   As a participant in the government's Home Affordable Modification Program, Homeward had the express duty to notify Fannie Mae and Freddie Mac immediately in the event that any of the representations, warranties, or covenants made by Homeward in the Servicer Participation Agreement ceased to be "true and correct."[58] Despite this directive, Homeward failed to notify the government of all violations committed by the servicer and its third party contractors, of which it was aware.

135.   Specifically, Homeward did not (1) operate in compliance with all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements;[59] (2) perform its services in accordance with high professional standards of care, using qualified individuals with suitable training, education, experience and skills;[60] or (3) responsibly supervise and manage third-party contractors to ensure that services were being

---

[58] *See* AHMSI's Servicer Participation Agreement at Financial Instrument ¶ 5 "In the event that any of the representations, warranties, or covenants made herein cease to be true and correct, Servicer agrees to notify Fannie Mae and Freddie Mac immediately."

[59] *Id*. at Financial Instrument ¶ 5(b).

[60] *Id*. at Financial Instrument ¶ 5(d).

performed in accordance with HAMP program requirements.[61] This failure to properly report violations to Fannie Mae and Freddie Mac, as required by the Servicer Participation Agreement further renders Homeward's SPA-related certifications/representations of compliance false.

### XIII. FALSE CLAIMS ACT

136.    This is an action alleging violations of the federal False Claims Act, 31 U.S.C. §§ 3729-32 and seeking damages, civil penalties and other statutory relief on behalf of the United States and the Relators as a result of the Defendants' false records, statements, and claims.

137.    The False Claims Act generally provides, *inter alia*, that any person who (i) knowingly presents or causes to be presented to the United States for payment or approval a false or fraudulent claim, ***(ii) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim,*** **and (iii)** is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three (3) times the amount of damages sustained by the Government because of the false claim. 31 U.S.C. §§ 3729(a)(1)(G).

138.    The False Claims Act allows any person having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for himself and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730(d). Relators claim entitlement to a portion of any recovery obtained by the United States as they, on information and belief, the first to file, and are original sources for the information on which the allegations or transactions in the claims herein are based.

---

[61] *Id*. at Financial Instrument ¶ 6.

**Relators' Second Amended Complaint**                                                                    **91**

139.     Based on these provisions, Relators, on behalf of the United States Government, seek, through this action, to recover damages, civil penalties and other statutory relief arising from the Defendants' submission of false and/or fraudulent claims for approval and/or payment and Homeward's use of false records or statements that would be material to a decision of the United States to pay Homeward requests under its contract. The United States has suffered significant actual damages as a result of the Defendants' false and fraudulent claims and its use of false records or statements material to false or fraudulent claims.

140.     As required under the False Claims Act, Relators have provided the offices of the Attorney General of the United States and the United States Attorney for the Eastern District of Texas a disclosure statement of material evidence and information related to and supporting the allegations in this complaint before the filing of the Complaint.

141.     Homeward falsely certified in its Servicer Participation Agreement on or around July 10, 2009, Exhibit 1**,** that it was in full compliance with all relevant laws, including but not limited to TILA, at the time of its execution of the Servicer Participation Agreement and Financial Instruments. By these individual material false certifications and false statements, Homeward **__fraudulently induced__** the United States, through its Financial Agent, to enter the Agreement with Homeward and **__to purchase__** the overarching Financial Instrument. Homeward made repeated false Subsequent Certifications to the United States annually, on or about June 1, 2010, June 1, 2011, June 1, 2012, and June 1, 2013 in the form set forth in the Servicer Participation Agreement, that it had and would comply with all relevant laws, including but not limited to TILA and other Federal and state laws designed to prevent unfair, discriminatory or predatory lending practices, when it had not done so. Homeward has however, knowingly failed

to provide required TILA/Regulation Z notices of right of rescission to borrowers for the secured additional advances, both in and out of the HAMP program, and failed to comply with the state laws set forth above.

## XIV. CAUSES OF ACTION

**A.     First Cause of Action -False Claims 31 U.S.C. § 3729(a)(1)(A)**

142.    Relators re-allege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs numbered 1 through 141 of this complaint. Therefore, Homeward has knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of **31 U.S.C. 3729(a)(1)(A).**

**B.     Second Cause of Action - False Claims 31 U.S.C. § 3729(a)(1)(B)**

143.    Relators re-allege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs numbered 1 through 142 of this complaint. Therefore, Homeward has knowingly made, used or caused to be made or used a false record or statement material to a false or fraudulent claim in violation of **31 U.S.C. § 3729(a)(1)(B). The false statements also included false statements and certifications made to fraudulently induce the U.S. to approve Homeward's SPA and to induce the U.S. to purchase Homeward's Financial Instrument.**

## PRAYER AND REQUEST FOR RELIEF

144.    On behalf of the United States, Relators seek to recover all relief available under the False Claims Act, as amended. Relators seek monetary damages equal to three (3) times the damages suffered by the United States. In addition, Relators seek to recover all civil penalties and other relief on behalf of the United States Government and the Relators in accordance with

the False Claims Act.

145.     Relators should, for their contribution to the Government's investigation and recovery, be awarded a fair and reasonable Relator's share pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

146.     Relators seek to be awarded all costs and expenses for this action, including statutory attorneys' fees, expenses, court costs and any available pre-judgment or post-judgment interest at the highest rate allowed by law.

WHEREFORE, premises considered, Relators pray that this District Court enter judgment on behalf of the United States and against the Defendants for the following:

a.      damages in the amount of three (3) times the actual damages suffered by the United States and all statutory penalties arising from the Defendants' unlawful conduct which violated the False Claims Act;

b.      a Relator's Share from the recoveries in a statutory amount which is fair and reasonable under the circumstances;

c.      Relators' statutory attorneys' fees, expenses, and costs of court;

d.      pre-judgment and post-judgment interest, at the highest rate allowed by law; and

e.      all other relief to which Relators and/or the United States may be justly entitled, whether at law or inequity, and which the District Court deems just and proper.

Dated: March 3, 2015

**UNITED STATES OF AMERICA, ex rel. Michael J. Fisher and Brian Bullock**

Respectfully submitted:

By: /s/ Samuel L. Boyd
Samuel L. Boyd
Texas SBN: 02777500
Catherine C. Jobe
Texas SBN: 10668280
BOYD & ASSOCIATES, PC
6440 North Central Expressway, Suite 600
Dallas, Texas 75206-4101
Telephone (214) 696-2300
Facsimile (214) 363-6856
sboyd@boydfirm.com

**Counsel for Relators Michael J. Fisher and Brian Bullock**

/s/ Thomas M. Melsheimer
Thomas M. Melsheimer
txm@fr.com
Texas Bar No. 13922550
Chad B. Walker
cbwalker@fr.com
Texas Bar No. 24056484
**FISH & RICHARDSON P.C.**
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070 (Telephone)
(214) 747-2091 (Facsimile*)*

/s/ William T. "Tommy" Jacks
jacks@fr.com
Texas Bar No. 10452000
**FISH & RICHARDSON P.C.**
One Congress Plaza, Suite 810
111 Congress Avenue
Austin, TX 78701
(512) 472-5070 (Telephone)
(512) 320-8935 (Facsimile)

**Counsel for Relators Michael J. Fisher and Brian Bullock**

*/s/ Roger D. Sanders*
Roger D. Sanders
TX SBN 17604700
J. Michael Young
TX SBN 00786465
Sanders, O'Hanlon, Motley & Young, PLLC
III South Travis
Sherman, TX 75090
(903) 892-9133 (Tel.)
(903 892-4300 (Fax)

**Local Counsel for Relators Michael J. Fisher and Brian Bullock**

**Relators' Second Amended Complaint**                                    **96**

## CERTIFICATE OF SERVICE AND DISCLOSURE

Relators' Motion to Seal the foregoing Amended Complaint was filed on October 16, 2014. The undersigned certifies that the forgoing Amended Complaint was filed under seal in accordance with the Local Rules of the United States District Court for the Eastern District of Texas and the Federal Rules of Civil procedure.

On August 9, 2012 Relator served a copy of his Disclosure Statement to US Attorneys Shamoil Shipchandler and Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division, and to United States Attorney General Eric Holder.

On August 20, 2012 Relator served a copy of his Disclosure Statement and proposed Original Complaint to US Attorney Kevin McClendon for USDC for the Eastern District of Texas, Scott Hogan, U.S. Attorney for the Northern District of Texas, Dallas Division and to US. Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C.

On August 20, 2012, a copy of Relator's Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon Eric Holder, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW. Washington, DC 20530-0001.

On August 14, 2014 and October 6, 2014, Relator provided copies of Supplemental Disclosure statements to US Attorney Kevin McClendon for USDC for the Eastern District of Texas, Scott Hogan, U.S. Attorney for the Northern District of Texas, Dallas Division and to US. Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C.

On October 16, 2014 a copy of Relators' First Amended Complaint was provided to US Attorneys Shamoil Shipchandler and Kevin McClendon for the United States District Court for the Eastern District of Texas, Sherman Division and to US. Attorney William Edgar, Senior Trial Counsel, Department of Justice, Washington D.C.

On October 16, 2014, a copy of Relator's First Amended Complaint filed under seal was formally served pursuant to FRCP 4(i)(1)(b), via Certified Mail, Return Receipt Requested, upon Eric Holder, Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW. Washington, DC 20530-0001.

The undersigned certifies that the forgoing proposed Second Amended Complaint was filed and served electronically via the Court's Electronic Case Filing system in accordance with the Local Rules of the United States District Court for the Eastern District of Texas and the Federal Rules of Civil procedure on March 3, 2015.

/s/Samuel Boyd
Samuel L. Boyd

**Relators' Second Amended Complaint**                                    **97**